**In re UNITED HEALTHCARE SYSTEMS INC., Debtors.**

**No. 97–21785(NLW).**

United States Bankruptcy Court, D. New Jersey.

Sept. 3, 2002.

Dennis J. O'Grady, Esq., J. Alex Kress, Esq., Riker, Danzig, Scherer, Hyland & Perretti, LLP, Morristown, NJ, for the Official Committee of Unsecured Creditors of United Healthcare Systems, Inc.

John C. Turi, Deputy Attorney General, Office of the Attorney General of NJ, Trenton, NJ, for New Jersey Department of Labor.

### OPINION

NOVALYN L. WINFIELD,
Bankruptcy Judge.

The issue presently before the Court is whether the reimbursement claim filed by the New Jersey Department of Labor ("NJDL" or the "Department") against the debtor, United Healthcare System, Inc., ("United" or the "Debtor") should be afforded priority of payment as either an administrative expense claim pursuant to 11 U.S.C. §§ 503(b)(1)(B) and 507(a)(1), or a priority tax claim pursuant to 11 U.S.C. § 507(a)(8)(D) or (E). The Official Committee of Unsecured Creditors (the "Committee") asserts that the administrative expense claim and the priority tax claim filed by NJDL should both be reclassified as general unsecured claims and paid accordingly. For the reasons set forth at greater length below, and after consideration of the undisputed facts and the pertinent statutory and case authority, this Court finds that, subject to the Committee's right to challenge the mathematical computations of the claims, NJDL holds an administrative expense claim in the amount of $79,226.90, and a priority tax claim in the amount of $9,164,463.24.

This Court has jurisdiction in this matter under 28 U.S.C. § 1334, and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(K), arising in the bankruptcy case of the Debtor pending before this Court. The following constitutes the Court's findings of fact and conclusions of law as required by Federal Rules of Bankruptcy Procedure 7052.

## FACTS

United, which was the Children's Hospital of New Jersey, was a nonprofit corporation that provided hospital and healthcare services primarily to Newark, Orange and Irvington, New Jersey. On February 19, 1997, United filed for Chapter 11 relief under Title 11 of the Bankruptcy Code. Within forty-eight (48) hours after it filed its bankruptcy petition, United ceased providing healthcare services and either discharged its patients to their homes or transferred them to other healthcare facilities.

Upon discovering United's predicament, and in accordance with the NJDL's procedures when dealing with mass layoffs, the NJDL dispatched a crew to United to process the employees' claims for unemployment benefits. These claims were primarily processed on February 25, 26, and 27, 1997, and ultimately given a claim date of March 9, 1997. United essentially ceased all employment as of March 8, 1997.

Though most New Jersey employers are contributory employers required to make quarterly unemployment payments to the NJDL based on a percentage of their employees' wages, as a nonprofit organization, United was entitled, in lieu of making quarterly contribution payments, to instead elect to reimburse the NJDL only for those benefits actually paid to its former employees. *See* N.J.S.A. 43:21–7.2, *et seq.* (the "Election Statute"). United made such an election in 1972 and reimbursed the NJDL pursuant to this election each year until it filed for bankruptcy in 1997.[1]

Before its bankruptcy case was commenced, United failed to reimburse NJDL for the unemployment benefits NJDL paid to its former employees for the fourth quarter of 1996 and the first quarter of 1997. As set forth in the Amended Proof of Claim of the State of New Jersey Division of UI/DI Financing ("Priority Claim") submitted by NJDL, unpaid prepetition reimbursement charges amount to $932,704.37, together with interest as of the petition date of $8,597.93, for a total of $941,302.30. Additionally, the Priority Claim includes other unpaid prepetition obligations such as employer State disability plan contributions and assessments and worker unemployment and disability contributions for a total Priority Claim amount of $1,156,170.05.

The NJDL also filed an Amended Administrative Proof of Claim for the State of New Jersey Division of Employer Accounts which totals $8,302,427.84 ("Administrative Claim"). The greatest portion of the Administrative Claim constitutes reimbursement charges that NJDL attributes to the unemployment benefits which it paid to former United employees postpetition as a result of United's shutdown within weeks after filing its Chapter 11 case. The claimed amount due for postpetition reimbursement charges amounts to $6,240,640.63, with interest through December 17, 2000 of $1,982,520.58, for a total of $8,223,160.94.

It is important to understand how NJDL calculates the reimbursement charges which constitute the larger portions of the Priority Claim and the Administrative Claim. The amount of weekly unemployment benefits payable to an individual is based on the average weekly wage during his base year, subject to a maximum amount per week and per claim.

---

1. The terms "payment in lieu of contribution" and "reimbursement charge" both describe the obligation owed by a nonprofit entity to the state unemployment compensation fund for benefits paid to former employees, and the terms will be used interchangeably throughout the opinion.

N.J.S.A. 43:21–3. The Base Year usually consists of "the first four of the last five completed quarters immediately preceding an individual's benefit year."[2] N.J.S.A. 43:21–19(c)(1). A benefit year consists of "the 364 consecutive calendar days" following the date upon which a claim for benefits is filed. N.J.S.A. 43:21–19(d). As indicated earlier, March 9, 1997 was the claim date for the benefits paid to United's employees who were let go shortly after the Chapter 11 case was commenced. Working from that date, the Base Year was calculated to be the fourth quarter of 1995, and the first, second and third quarters of 1996, all of which fall within the prepetition period.

The Administrative Claim also includes a claim for unpaid postpetition employer contributions and other obligations such as assessments for the State disability plan. After filing its petition, United was no longer entitled to make reimbursement payments pursuant to the Election Statute. Instead, United was required to participate as a contributory employer, making quarterly payments based on a percentage of its employees' wages. This portion of the Administrative Claim is based on wages paid to the few employees that remained after the shutdown and the total, inclusive of interest and penalties, amounts to $79,266.90.

Initially, the Committee objected to the NJDL claim on the basis that the Debtor's books and records did not reflect the amounts claimed by NJDL.[3] That objection was superceded by the objections set forth in its Memorandum of Law in Further Support of Committee's Motion to Expunge, Reduce and Reclassify the Pri-

ority and Administrative Claims of the New Jersey Department of Labor. The Committee now seeks to reclassify most of the Administrative Claim and the Priority Claim as a general unsecured claim. It concedes that it is appropriate to grant administrative expense status to the unpaid employer/employee contributions and related expenses incurred postpetition because certain employees were employed for a short time after the bankruptcy filing. Accordingly, subject to verifying the mathematical computation and underlying data, the Committee agrees that $79,266.90 of the Administrative Claim is properly classified as such. Similarly, the Committee concedes that some portion of the Priority Claim may be entitled to that classification because a portion of it is based on United's failure to pay the employees' contribution for disability insurance which was withheld from employees' wages. However, the Committee reserves the right to further review the amount and classification of this portion of the NJDL Priority Claim. At present, the Committee's objection to the NJDL claim is directed solely at reclassifying as general unsecured claims the Priority Claim reimbursement charges totaling $941,302.30, and the Administrative Claim reimbursement charges totaling $8,223,160.94. With regard to both claims, the Committee asserts that the reimbursement charges are not taxes and therefore are not subject to classification under any subparagraph of 11 U.S.C. § 507(a)(8). The Committee also argues that the reimbursement charges sought as part of the NJDL Administrative Claim do not meet any of the criteria for administrative claims under 11 U.S.C. § 503(b).

---

**2.** The statute provides for alternate Base Years in the event a claimant is not able to satisfy the requirements of the regular Base Year. N.J.S.A. 43:21–19(c)(1).

**3.** Earlier in the case, the Debtor and the Committee divided the litigation responsibilities, with the Debtor undertaking the preference litigation and the Committee concentrating on claims analysis and objections.

NJDL emphatically disagrees with the Committee's analysis.

## DISCUSSION

### A. Reimbursement Charges are Taxes.

 As a preliminary matter, the Committee reminds the Court that "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. Internal Revenue Service,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). Further, it is well recognized that statutory priorities are narrowly construed because it is presumed that the debtor's limited resources will be equally distributed among his creditors. *See Trustees of the Amalgamated Insurance Fund v. McFarlin's Inc.,* 789 F.2d 98, 100–101 (2d Cir.1986); *In re Metro Transportation Co.,* 117 B.R. 143, 154 (Bankr. E.D.Pa.1990).

 However, it is an unfortunate reality that in many cases bankruptcy estate funds will not be sufficient to pay all creditors. Thus, section 507 reflects that Congress has determined that certain classes of claims should be preferred over, and paid ahead of, other claims. Accordingly, although it is reasonable to construe priorities narrowly so that some estate funds will be available for payment of general unsecured claims, the Court must not construe a priority so narrowly that it undercuts the purpose of a particular priority. The Court should, if possible, rule in a fashion that recognizes the competing bankruptcy policies embodied in the statute. With these competing policies in mind, the Court must examine the question for consideration: whether a payment in lieu of contribution is a tax, and if so, whether it falls within the scope of one of the subsections of 11 U.S.C. § 507(a)(8). Because the term "tax" is not a defined term in the Bankruptcy Code, it is neces-

sary to look to case law for assistance. Whether a state statute creates a tax within the meaning of the bankruptcy statute is a federal question. *See State of New Jersey v. Anderson,* 203 U.S. 483, 491–92, 27 S.Ct. 137, 51 L.Ed. 284 (1906). Further, a tax has been defined by the Supreme Court as "a pecuniary burden laid upon individuals or [their] property" regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it. *City of New York v. Feiring,* 313 U.S. 283, 285, 61 S.Ct. 1028, 85 L.Ed. 1333 (1941); *see also Anderson,* 203 U.S. at 492, 27 S.Ct. 137. Application of this definition in the bankruptcy context has not been an easy task, and courts have formulated additional criteria for determining when a governmental claim is entitled to priority treatment. The two cases that are most cited for additional criteria that identify the attributes of a tax are *County Sanitation Dist. No. 2 of Los Angeles County v. Lorber Indus. of California, Inc. (In re Lorber Industries of California),* 675 F.2d 1062 (9th Cir.1982) and *Ohio Bureau of Workers' Compensation v. Yoder, (In re Suburban Motor Freight, Inc.),* 36 F.3d 484 (6th Cir.1994) *("Suburban II").*

In *Lorber,* the Ninth Circuit considered whether the claim filed by a county sanitation district for fees imposed on the debtor to dispose of hazardous waste constituted a tax entitled to priority treatment. The Court identified the elements that characterize a tax to be as follows: "(a) an involuntary pecuniary burden, regardless of name, laid upon individuals or property; (b) imposed by, or under authority of the legislature; (c) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; (d) under the police or taxing power of the state." 675 F.2d at 1066. Finding that Lorber's obligation arose from its de-

cision to acquire a permit and use the sanitation system to dispose of its wastewater, the Court characterized the obligation to the sanitation district as voluntary and more contractual in nature, and thus not a tax entitled to priority. *Id.*, at 1067.

In *Suburban II*, the Ohio workers' compensation bureau claimed priority status for reimbursement of workers' compensation payments which it had made as a result of the debtor's failure to pay premiums when it was a participant in the workers' compensation fund, and the debtor's failure to pay claims which arose when it was a self-insured employer. The Sixth Circuit found that meeting the criteria of the *Lorber* test was necessary in order for a government claim to be afforded priority as an excise tax, but that it was not enough to meet the concerns expressed by the Sixth Circuit in its earlier decision, *Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Motor Freight, Inc.)*, 998 F.2d 338 (6th Cir.1993) *(Suburban I) See Suburban II*, 36 F.3d at 488–89.

In *Suburban I*, the Court observed that the problem with the *Lorber* test is that all monies collected by the government is used to defray its expenses and is used for public purposes. 998 F.2d at 341. It thus concluded that "[t]he threat of the *Lorber* reasoning then, is that the Government automatically wins priority for all money any debtor owes it, regardless of the nature of the payments." *Id.* Accordingly, to limit the breadth of the "public purpose" prong, *Suburban II* posited that the government exaction (1) must be universally applicable to similarly situated entities; and (2) that according priority treatment to the government claim does not disadvantage private creditors with like claims. *Suburban II*, 36 F.3d at 488.

■ The Committee argues that after applying the *Lorber* test as modified by *Suburban II*, the Court must find that the non-tax attributes of the reimbursement charges sought by the NJDL outweigh the tax attributes. Specifically, the Committee contends that the reimbursement charges are voluntary because the reimbursement charges arise solely from United's voluntary act of making the election to make payments in lieu of contribution to the Unemployment Compensation Fund, instead of participating as a contributing employer. The Committee also urges that the non-tax nature of the reimbursement charges is evident from their contingent nature; they are paid only if the employee is discharged, files a claim and is qualified, and only to the extent the employee was employed by the employer during the Base Year. Thus, the Committee suggests that the reimbursement charges fail the *Suburban II* requirement that a government obligation be universally applicable to similarly situated entities. Finally, the Committee urges that this Court follow the reasoning articulated by the First Circuit in *In re Boston Regional Medical Center, Inc.*, 291 F.3d 111, 122 (1st Cir. 2002). There, the First Circuit stated that the right of the Massachusetts Division of Employment and Training to require a nonprofit employer to provide a surety bond tipped the scales in favor of finding that an employer's payment in lieu of contribution was not a tax. The First Circuit found the bond requirement decisive because one of the reasons that Congress affords priority in payment for certain taxes is that taxing authorities are involuntary creditors who cannot take security in advance. *Id.*, at 122–23. The Committee submits that this Court should find that the ability of the New Jersey Labor Commissioner to require a not for profit entity to post a bond to secure payment of reimbursement charges tips the scales in favor

of a finding that non-tax attributes predominated.

Although some of the Committee's arguments are not without weight, they are ultimately not as persuasive as those advanced by NJDL in support of its contention that reimbursement charges are taxes entitled to priority treatment.

The NJDL correctly points out that the New Jersey statute requires all employers covered by the statute to contribute to the unemployment compensation fund. N.J.S.A. 43:21–7. The only choice afforded any nonprofit entity is to pay quarterly unemployment insurance contributions, like for-profit entities, or to reimburse NJDL for any unemployment benefits NJDL paid to its former employees. N.J.S.A. 43:21–7.2.[4] Because United could not escape its statutory obligation to make payments to the Unemployment Compensation Fund, it was subject to an involuntary pecuniary burden imposed by the legislature as described in the *Lorber* test. United was only able to choose how to make the payments, not whether to make the payments. The Committee simply misperceives the significance of this choice. Regardless of how it paid, as an employer in the State of New Jersey, United was required to contribute to the unemployment compensation fund, and the reimbursement charges owed to NJDL are involuntary exactions. *See, e.g., In re Sacred Heart Hospital of Norristown,* 209 B.R. 650, 656 (E.D.Pa.1997) (payments in

lieu of contributions are required by the Pennsylvania Statute and are involuntary payments); *In re Cottage Grove Hospital,* 265 B.R. 241, 245 (Bankr.D.Or.2001) (reimbursement payments to Oregon Unemployment Trust Fund were not voluntarily incurred).

It is also readily evident that the New Jersey unemployment compensation law was enacted for a public purpose and pursuant to the police power. The statute declares that "economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature...." N.J.S.A. 43:21–2. The statute further states that the effects of involuntary unemployment can be partially met by "the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance," and that the Legislature was enacting the unemployment compensation law "under the police powers of the state." *Id.* This statutorily articulated purpose accordingly satisfies the *Lorber* requirements that a tax serve a public purpose and be enacted under the police or taxing power of the state.

The Court also agrees with NJDL that the reimbursement charges satisfy the two

---

4. N.J.S.A. 43:21–7.2 specifically addresses nonprofit organizations. At paragraph (a)(1) it provides:

(1) Any nonprofit organization which is, or becomes, subject to the Unemployment Compensation Law on or after January 1, 1972, shall pay contributions under the provisions of R.S. 43:21–7, unless it elects in accordance with this paragraph to pay to the unemployment fund an amount equal to the amount of regular benefits and½ of the

extended benefits paid that are attributable to base year service in the employ of such nonprofit organization during the effective period of such election.

At paragraph (a)(9) it further states that "[a]s of the effective date of the termination of an election to make payments in lieu of contributions, a nonprofit organization shall become liable to pay unemployment insurance contributions on taxable wages paid to its employees subsequent to the termination."

elements of the public purpose test set out in *Suburban II*. As previously discussed, the New Jersey statute requires all employers to make payments to the unemployment compensation fund. Moreover, like the Pennsylvania statute discussed in *Sacred Heart Hospital*, 209 B.R. at 656, the New Jersey statute does not permit any private or self-insurance options. Therefore, the requirements that the exaction be universally applicable and that the government claim not disadvantage private creditors with like claims are also met.

It should be noted that the First Circuit Court of Appeals recently reached a contrary result in *In re Boston Regional Medical Center, Inc.*, 291 F.3d 111 (1st Cir. 2002). It grounded its holding that payments in lieu of contributions are not taxes in part on its determination that such obligations are not universally applicable as required by the *Suburban II* test. 291 F.3d at 122. The Court stated that "[t]he distinction between the payments required to sustain a government undertaking as a whole and those required merely to compensate for the costs imposed by a particular participant is significant." *Id.* In this regard, the Court found it important that employers who make contribution payments shoulder the costs for administering the system, and keeping the system solvent; whereas, employers making payments in lieu of contributions only reimburse the unemployment compensation fund for the costs directly attributable to them. *Id.*

This Court respectfully disagrees that there is a material difference between employer contribution payments and payments in lieu of contributions for purpose of satisfying the universality requirement of the Suburban II test. In *Suburban II*, the Court stated that "[t]he universality requirement ensures that the financial exaction's burden and benefit inure to the

general public welfare, and that it not provide a discrete benefit to, or result from privileges claimed by, the payor." 36 F.3d at 488–89. Both employer contributions and payments in lieu of contributions meet this concern because they are paid to the unemployment compensation fund for the purpose of providing benefits designed to prevent unemployed workers from becoming a public burden. The fact that employers paying contributions absorb a greater share of the cost, does not mean that payments in lieu of contributions are not universal, and therefore not taxes. The payment burden of many tax statutes falls unevenly on taxpayers. One such statute that readily comes to mind is the federal income tax statute. Depending on a taxpayers eligibility for deductions, exclusions, or credits, even within a particular tax bracket some taxpayers will pay more, and others will pay less. Yet, the tax payments made by each are contributed for the general welfare of the country. Notably, in one of its first decisions which addressed the constitutionality of the unemployment compensation act, the Supreme Court held that a state is free to select the subjects of taxation and to grant exemptions, and due process does not impose upon a state any rigid rule of equality of taxation. *See Carmichael, et al. v. Southern Coal & Coke Co.*, 301 U.S. 495, 509, 57 S.Ct. 868, 81 L.Ed. 1245 (1937).

The Court in *Boston Regional* also finds it significant that the nonprofit employers who may elect to make payments in lieu of contributions are also exempt from federal income tax. *See Boston Regional*, 291 F.3d at 122. Similarly, the Committee also argues that the legislative history reveals that Congress intended to continue the non-taxable status of nonprofits, and therefore the reimbursement charges should not be viewed as taxes. It quotes the Senate Report as follows:

Under existing Federal law, services performed for nonprofit religious, charitable, educational and humane organizations and for a State and its political subdivisions are exempt from the tax provisions of the Federal Unemployment Tax Act.... The committee does not want to change the present tax status of nonprofit organizations, but is concerned about the need of their employees for protection against wage loss resulting from unemployment.

S.Rep. No. 91–752, 91st Cong., 2nd Session, reprinted in 1970 U.S.Code, Cong., Admin. News 3606, 3617–18 (Mar. 26, 1970).

Further, the Committee argues that the non-tax nature of the reimbursement charges is evident from the following statements in the Senate Report:

The States would be required also to provide nonprofit organizations with the option of reimbursing the State for unemployment compensation payments attributable to service with the organization in lieu of paying contributions under the normal tax provisions of the State law. In effect, the nonprofit organizations would be allowed to adopt a form of self-insurance. Under the reimbursement method of financing, a nonprofit organization whose workers experience no compensated unemployment in a year would have no unemployment insurance costs for the year. The committee considers it appropriate that these organizations, which are often dependent upon charitable contributions, should not be required to share in the costs of providing benefits to workers in profit-making enterprises.

Id. At 3618 (emphasis added).

However, neither the legislative history cited by the Committee nor the exemption afforded nonprofit organizations from payment of federal income tax state a

Congressional intent that nonprofit organizations be exempted from state unemployment taxes. First, as is evident from the legislative history, Congress only exempted nonprofit organizations from the tax provisions of the Federal Unemployment Tax Act, it did not exempt nonprofit organizations from state unemployment taxes. Instead, both the federal statute and its legislative history are simply silent as to how to characterize payments in lieu of contribution. Second, the legislative history merely describes payments in lieu of contributions as being a form of self insurance. In fact, such description is not quite accurate because payments are made to former employees from the unemployment compensation fund rather than the nonprofit entity as is typically done under a self-insurance program. The statement in the Senate Report analogizing payments in lieu of contributions to self-insurance makes more sense if we read it to mean that by making payments in lieu of contributions, nonprofit organizations, like self-insurers, will experience reduced costs in connection with the payment of benefits. Moreover, such a reading is consistent with the concern expressed in the Senate Report that because nonprofit entities are often dependent on charitable contributions they should not be required to share in the cost of providing benefits to workers in profit-making enterprises. All of this is entirely consistent with a reduced tax burden, rather than no tax burden.

Finally, the fact that nonprofit organizations are exempt from federal income tax does not indicate that payments in lieu of contribution are not taxes. Importantly, a nonprofit organization which does not make the election must pay employer contributions. Moreover, in New Jersey, if any nonprofit organization fails to timely

make its payments in lieu of contributions, its right to the election may be terminated. In such case, the nonprofit entity can only make employer contributions. N.J.S.A. *43:21–7.2(g)*. It is well settled that employer contributions to state unemployment and disability funds are taxes. *Sipe v. Amerada Hess Corp.*, 689 F.2d 396, 402 (3rd Cir.1982); *In re William, Akers, Jr. Co., Inc.*, 121 F.2d 846, 851 (3rd Cir.1941). Thus, it is readily apparent that nonprofit employers in New Jersey may be subject to pay unemployment compensation taxes notwithstanding their exemption from federal income taxes.

In *United States v. Reorganized CF & I Fabricators of Utah, Inc., et al.*, 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996), the Supreme Court addressed whether the government's claim arising under 26 U.S.C. § 4971(a) was an excise tax entitled to priority treatment, or a penalty entitled to treatment only as an unsecured claim. The Court found that to answer the question posed, it had to engage in a functional examination of § 4971(a). 518 U.S. at 224, 116 S.Ct. 2106. For the legal framework for this analysis, the court relied on its prior decisions under the Bankruptcy Act, noting that "In each instance the decision turned on the actual effects of the exactions." *Id.* at 221, 116 S.Ct. 2106.

The Court in *Sacred Heart Hospital* performed such an analysis in reaching its conclusion that payments in lieu of contributions are taxes. It determined that because all employers were required to contribute payments in lieu of contributions the payments were involuntary. 209 B.R. at 656. It found that the payments benefitted the public generally, because "compensating unemployed workers reduces the chances of them becoming poor and making demands on the federal and state welfare system and thus all taxpayers."

*Id.* The Court also contrasted the payments in lieu of contributions with worker's compensation fund premiums where state law permits employers to (i) subscribe to the state run fund, (ii) obtain private insurance, or (iii) self insure. It readily concluded that by reason of these choices, payment to the worker's compensation fund is neither mandatory nor monopolistic because insurance coverage can be obtained elsewhere. *Id.* at 657. By contrast, no private insurance exists for the unemployment compensation and there is no true self insurance because the employer only reimburses the fund for payments the fund makes to former employees. *Id.*

As previously discussed, the New Jersey statute is essentially similar to the Pennsylvania statute and application of the analysis provided in *Sacred Heart Hospital* to the present matter yields the conclusion that the payments in lieu of contributions permitted by the New Jersey worker's compensation statute are also taxes.

In *Boston Regional*, the decisive factor for the First Circuit was the fact that the nonprofit employer could be required to provide a surety bond to insure collection of payments in lieu of contributions. *Boston Regional*, 291 F.3d at 122. It reasoned that the ability to require a bond gives the Massachusetts Division of Employment and Training the ability to choose its debtors and to obtain advance security, thereby eliminating the primary reason for giving taxes preferred treatment in a bankruptcy case. *Id.*, at 122–23, citing *H.R. Rep.* No. 95–595, at 190 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6150. The ability of a government to require a bond cuts against one of the reasons that Congress granted a priority of payment to taxes in bankruptcy, but it does not describe a non-tax attribute. As NJDL

points out, under the State Tax Uniform Procedure Law, the Director of the Division of Taxation, "may require a bond or other security ... for the payment of any taxes, interest, and penalties imposed pursuant to any state tax law...." N.J.S.A. 54:49–2.

It is possible however, that a surety with the same claim as the government could be disadvantaged if the government claim received priority. In such a case one of the two criteria of the *Suburban II* test would not be met. Nonetheless, like the Court in *Sacred Heart Hospital*, this Court finds that the other tax-like attributes of the payments in lieu of contributions out-weigh "this single non-tax characteristic." *Sacred Heart Hospital*, 209 B.R. at 658.

### B. Reimbursement Charges Enjoy Priority Under § 507(a)(8)(E)

 The obligation of United to reimburse the New Jersey Unemployment Compensation Fund for benefits paid to former United employees fits within the definition of excise tax. Although "excise tax" is not a defined term in the Bankruptcy Code, it has been characterized as an indirect tax in that it is not directly imposed upon persons or property. *New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714, 719 (4th Cir.1989). Moreover, it is understood as a tax that is imposed on the performance of an act, the engaging in any occupation, or the enjoyment of a privilege. *Id.; Cottage Grove Hospital*, 265 B.R. at 245, n. 10; *In re Templar*, 170 B.R. 562, 563 (Bankr.M.D.Pa.1994). Most broadly, excise taxes are held to be involuntary payments imposed to serve a public purpose. *In re Ludlow Hospital Society, Inc.*, 216 B.R. 312, 319 (Bankr.D.Mass. 1997). NJDL urges that United's act of employing workers constitutes conduct contemplated by the foregoing definitions.

The NJDL points out that the Pennsylvania Supreme Court has found that unemployment contributions are imposed on employers for the privilege of employing workers. *Department of Labor & Indus. v. New Enterprise Rural Elec. Co-op.*, 352 Pa. 413, 43 A.2d 90, 92 (1945) ("unemployment compensation contributions constitute an excise tax on the right to employ"). This Court agrees. Because reimbursement charges, like contributions arise from the privilege or act of employing workers, they too are excise taxes. Accordingly, the reimbursement charges owed by United fall under section 507(a)(8)(E)(ii) which provides priority of payment to excise taxes on a "transaction occurring during the three years immediately proceeding the date of the filing of the petition."

### C. Reimbursement Charges Are Not Employment Taxes

 However, the Committee is correct in its assessment that the reimbursement charges sought by NJDL are not entitled to priority under section 507(a)(8)(D) because they are not levied on wages, salaries, or commissions, but result instead from the amount of benefits paid to former employees under N.J.S.A. 43:21–7.2. The reimbursement charges are removed in time from the payment of wages, in that they are based on benefits paid only after unemployment occurs and the employee qualifies for benefits. There is no immediate connection between the wage earned and the benefit paid. To grant priority to the NJDL's reimbursement claim as an employment tax would serve to expand the narrowly defined priority given to employment taxes under the Code.

Most persuasive is the analysis provided by the Bankruptcy Court in *In re Boston Regional Medical Center*, 256 B.R. 212 (Bankr.D.Mass.2000). The *Boston Regional* court pointed out that the reim-

bursement charges are not collected directly from the payroll when wages are paid, but are assessed against the employer after the unemployment benefits are paid. *Id.* At 226. Further, the reimbursement charges are based not on employment but unemployment, and the amount varies not because the size of the payroll fluctuates, but because the numbers of former employees who qualify for and receive benefits varies. *Id.* Finally, as observed by the Bankruptcy Appellate Panel, reimbursement charges may not be calculated solely on a wage, salary or commission earned from the debtor. Although the unemployment benefits (and therefore the reimbursement charges) are calculated from a base year of wages paid, the amount of reimbursement charges for which an electing nonprofit employer may be liable will be affected if the employee claiming the benefits had other employers in the base period. *See In re Boston Regional Medical Center,* 265 B.R. 838, 846 (1st Cir. BAP 2001). Accordingly, because there is only an indirect correspondence between wages or salary paid and reimbursement charges assessed against a debtor that is an electing nonprofit employer, this Court finds that reimbursement charges are not employment taxes within the meaning of § 507(a)(8)(D).

### D. Reimbursement Charges Are Not Properly Classified As Administrative Expenses

 Nor are the reimbursement charges sought by NJDL entitled to administrative expense priority under 11 U.S.C. §§ 507(a)(1) and 503(b). NJDL relies on the fact that the employees were discharged postpetition and the benefit payments were made postpetition, for its conclusion that the reimbursement charges are entitled to a first priority of payment. The state's position fails because under § 503(b)(1)(B), only taxes "incurred by the estate" and not "a tax of a kind specified in § 507(a)(8) . . ." can be classified as administrative expenses. Logically then, only postpetition taxes can be treated as administrative expenses, because prior to the commencement of a bankruptcy case there is no bankruptcy estate. Further, because this section specifically excepts taxes under § 507(a)(8), an excise tax will only be entitled to administrative expense status if the "transaction" on which it is based occurs postpetition and is thus incurred by the estate. L. King, *Collier on Bankruptcy,* ¶ 503.07[2][e] (15th ed. revised 2002).

As the Committee points out, United made its election in lieu of contributions well before it filed for bankruptcy protection. Secondly, and most importantly, all of the employment on which the reimbursement charges are based, occurred in the prepetition period. The Base Year on which unemployment benefit s are paid are "the first four of the last five completed calendar quarters immediately preceding an individual's benefit year." N.J.S.A. 43:21–19(c)(1). Accordingly, the Base Year for former United employees was the fourth quarter of 1995, and the first, second and third quarters of 1996, all of which fell within the prepetition period. Administrative expense status is only appropriate for claims based on postpetition services. *See In re Roth American, Inc.,* 975 F.2d 949, 957 (3d Cir.1992) (holding that severance and vacation pay claims are afforded administrative expense priority to the extent those payments reimburse services provided to the estate postpetition). As explained in *In re Boston Regional Med. Ctr.,* 256 B.R. 212,

> Section 503(b)(1)(B)(i) defines administrative expenses to include only those taxes that are incurred by the estate, not those that the debtor incurred prepetition, before the estate was created. Accordingly, a tax statute must be ap-

plied with recognition that two distinct entities are involved—one existing up to the date of filing, and a second, the estate, existing from and after the filing—and that the latter is not responsible, on an administrative expense basis, for the liabilities of the former.

*Id.* at 228–229.

Thus, the only administrative expense claim that NJDL holds is its claim for $79,226.90, based on employer contributions due on employment in the postpetition period.

## *CONCLUSION*

As set forth at greater length in the preceding paragraphs, the Court finds that the NJDL is not entitled to administrative priority under § 503(b)(1)(B) since no taxes were incurred by the estate. Further, the obligation of a nonprofit organization to reimburse a state unemployment compensation agency for benefits paid to its employees is an excise tax, and thus entitled to priority under § 507(a)(8)(E) of the Bankruptcy Code. Accordingly, pursuant to § 503(b)(1)(B), the NJDL's administrative claim is hereby denied to the extent that it is based on pre-petition acts, and pursuant to § 507(a)(8)(E), the NJDL's reimbursement claim is hereby granted priority status.