In re Robert E. **MEWBORN**, Debtor.

No. 00–17206 (GMB).

United States Bankruptcy Court, D. New Jersey.

March 29, 2006.

Joseph J. Rogers, Esquire, Turnersville, NJ, Attorney for Debtor.

Janet Greenberg Cohen, Esquire, Office of the Attorney General of New Jersey, Trenton, NJ, Attorney for State of New Jersey, Department of Labor and Workforce Development, Unemployment Insurance.

## MEMORANDUM OPINION

GLORIA M. BURNS, Bankruptcy Judge.

Before the Court is Debtor, Robert E. Mewborn, Jr.'s ("Debtor"), motion to lift the attachment of unemployment benefits in violation of the § 362 stay. More specifically, the Debtor requests that the Court order the New Jersey Department of Labor and Workforce Development, Unemployment Insurance ("NJDOL") to cease seizing his unemployment benefits immediately and remit to him all funds seized during his 2004 period of eligibility. Also before the Court is the NJDOL's response thereto. For the reasons set forth below, the Court denies the Debtor's motion.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a), and the Standing Order of the United States District Court for the District of New Jersey dated July 23, 1984, referring all bankruptcy cases to the bankruptcy court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue of this case is proper in the District of New Jersey pursuant to 28 U.S.C. §§ 1408 and 1409. The following shall

constitute findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### FACTUAL BACKGROUND

In 1993, the Debtor applied to the NJDOL for unemployment benefits in the amount of $261.00 per week. After issuing the benefits, the NJDOL learned that the Debtor had in fact been employed by three different employers while receiving the benefits from May until December 1993. Accordingly, the NJDOL determined that the Debtor was ineligible to receive unemployment benefits during that period. The NJDOL notified the Debtor of the overpayment, but the Debtor failed to respond. As a result, the NJDOL administratively determined that the Debtor obtained the 1993 benefits through fraud and wilful misrepresentation. The Debtor did not appeal this determination. Consequently, a Certificate of Debt was entered against him on March 26, 1996 in the amount of $7,503.75.[1]

On September 1, 2000, the Debtor filed for chapter 13 bankruptcy protection. The Debtor's Schedule F lists a claim held by the NJDOL in the amount of $7,503.00. The NJDOL filed a proof of claim in the amount of $8,504.83 on October 11, 2000. The Debtor's chapter 13 plan, which was confirmed on March 27, 2001, provided for monthly payments of $75.00 for 36 months as well as a pro rata distribution to unsecured creditors. On March 8, 2002, the plan was amended to provide for payments of $50.00 per month for 42 months. On June 11, 2003, an Order was entered increasing the payments to $53.00 per month for the remaining 29 months. On May 5, 2004, the Debtor's plan was modified again to provide for payments of $79.00 per month for the remaining 17 months. Finally, on March 9, 2005, an Order was entered stating that the plan shall continue at $1,816.55 paid to date then $100.00 for the remaining 8 months with a wage order, commencing March 1, 2005 for a total of 60 months. To date the Debtor has made payments totaling $2,719.54, which completed the Debtor's plan.

On August 13, 2004, the Debtor was laid off by his employer and became eligible to receive unemployment benefits. Instead of paying the Debtor unemployment benefits, the NJDOL applied the benefits to its overpayment claim arising from the 1993 benefits that the Debtor received fraudulently. The NJDOL has recouped approximately $2,961.85 of its claim by seizing the Debtor's benefits and by receiving a small payment from the chapter 13 Trustee. The NJDOL asserts that the balance remaining on its claim is $3,041.15. The NJDOL acknowledges that its claim is dischargeable upon the successful completion of Debtor's chapter 13 plan.

In his motion, the Debtor argues that the NJDOL seized his 2004 benefits in violation of his § 362 stay. The Debtor also argues that the NJDOL is not entitled to recoup its 1993 overpayment claim by seizing his 2004 benefits, because the two do not arise from the same transaction, thereby failing to satisfy the Third Circuit's "integrated transaction test."

In its response, the NJDOL makes several arguments in support of its actions.

1. It is entitled to recoup overpayments pursuant to its police powers under N.J. Stat. § 43:21–1.

2. It distinguishes this case from the *Lee v. Schweiker*, because this case deals with unemployment benefits, while the *Lee* case dealt with social

---

1. This amount represents $6,003.00 in benefits paid, as well as $1,500.75, which represents a statutory fine and interest.

security benefits. More specifically, the NJDOL argues that New Jersey's unemployment benefits statute forms a contractual relationship, while social security benefits are social welfare "entitlements." The NJDOL further argues that unlike recipients of social security benefits, recipients of unemployment benefits do not contribute to the unemployment benefit fund individually. Finally, the NJDOL likens New Jersey's statute and its requirements to "an on-going contract."

3. The Debtor's fraudulent receipt of the 1993 benefits and his eligibility for 2004 benefits arise from the same transaction.

4. It did not violate the Debtor's stay because the 2004 benefits are post-petition benefits that are "neither property of the Debtor nor property of the estate."

In response to the NJDOL's arguments, the Debtor asserts that "social security benefits, like unemployment benefits, require that you have worked for a qualifying period of time in order to be eligible for payments." As such, unemployment benefits are also social welfare payments.

## LEGAL DISCUSSION

### I. The NJDOL is Subject to the Debtor's § 362 Stay

■ Section 362 of the Code prohibits the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1) (2004). However, a debtor's automatic stay "does not affect the commencement or continuation of an action or proceeding by a governmental unit to enforce the governmental unit's police or regulatory power." *See* 11 U.S.C. § 362(b)(4); *see also* Advisory Committee Notes to § 362. Section 362(b)(4)

is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate.

*Id.* The Third Circuit has found that:

Congress intended this exception to apply where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for such laws.

*In re University Medical Center,* 973 F.2d 1065, 1074–75 (3d Cir.1992). In other words, "§ 362(b)(4) only limits the government's police and regulatory power to enforce a money judgment outside of the bankruptcy. The government's power to seek entry of a civil penalty judgment for violations ... is not precluded." *United States of America v. LTV Steel Co., Inc.,* 269 B.R. 576, 582 (W.D.Pa.2001); *see also In re Ellis,* 66 B.R. 821, 826 (N.D.Ill.1986) (holding that the automatic stay was applicable, and state court action violated the stay where the focus of governmental police power was directed at the debtor's financial obligations rather than the state's health and safety concerns).

At issue in this motion is New Jersey's unemployment compensation statute. New Jersey's statute provides that, "under the police powers of the state ... the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed after qualifying peri-

ods of employment." N.J. Stat. § 43:21–2 (2004). Courts interpreting the statute have found that it is "evident that the New Jersey unemployment compensation law was enacted for a public purpose and pursuant to the police power." *In re United Healthcare Systems, Inc.*, 282 B.R. 330, 337 (Bankr.D.N.J.2002).

■ In this case, the NJDOL is exercising its police power pursuant to its unemployment compensation statute, N.J. Stat. § 43:21–1, et. seq. However, the NJDOL does not qualify for the § 362(b)(4) exception to Debtor's automatic stay, because it is not attempting to prevent or stop a fraud. The 1993 fraud has already been completed and there is no indication that the Debtor's 2004 application for benefits was fraudulent. Further, the NJDOL's recoupment is not focused on health or safety concerns for its citizens, but on its financial claim against the Debtor's estate. Moreover, the NJDOL is not recouping the Debtor's 2004 benefits in an attempt to fix a money judgment or a penalty. The NJDOL fixed this amount when it filed its proof of claim in Debtor's case. Instead, the NJDOL is attempting to enforce its Certificate of Debt outside of the bankruptcy.

Therefore, based on the foregoing, as a preliminary matter, the NJDOL is bound by the Debtor's § 362 stay, because it does not qualify for the § 362(b)(4) police power exception. As the NJDOL is bound by the Debtor's § 362 stay, the issue remaining before this Court is whether the NJDOL properly recouped the Debtor's 2004 benefits, or whether it improperly seized the benefits in violation of the Debtor's stay.

## II. The Debtor's Unemployment Benefits Are Property of the Estate

■ Pursuant to § 1306(a) of the Code, in addition to the property specified in § 541, a chapter 13 debtor's estate consists of:

(1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, or 11, or 12 of this title [11 USCS §§ 701 et seq., 1101 et seq., or 1201 et seq.], whichever occurs first; and

(2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title [11 USCS §§ 701 et seq., or 1101 et seq., or 1201 et seq.], whichever occurs first.

11 U.S.C. § 1306(a) (2004). The Third Circuit has found that "unemployment compensation benefits are earned by the employee because of past labor." *Gelof v. Papineau*, 829 F.2d 452, 454 (3d Cir.1987). Following that logic, the Debtor's 2004 unemployment benefits were earned prior to September 2004. As the Debtor's case has not been closed, dismissed, or converted, his 2004 benefits are property of his estate.[2]

Regardless of whether the Debtor's 2004 benefits are property of his estate, if the NJDOL did not properly recoup those benefits, it is not permitted to retain them.

## III. The NJDOL Properly Recouped the Debtor's 2004 Benefits

■ The common law doctrine of recoupment "is an equitable exception to the

---

**2.** At least one other court has held that a debtor "is not entitled to receive unemployment compensation under state law due to his prior fraud and/or failure to disclose a material fact, [because] he never 'acquired' the post-petition payments and those payments do not constitute 'earnings for services performed.'" *In re Adamic*, 291 B.R. 175, 187 (Bankr. D.Colo.2003).

automatic stay" and, as such, should be narrowly construed. *University Medical Center,* 973 F.2d at 1081; *In re Peterson Distributing, Inc.,* 82 F.3d 956, 959 (10th Cir.1996) (holding the doctrine of recoupment should be narrowly construed, in part because it "violates the basic principle of equal distribution to creditors"). Thus, unlike a creditor seeking a § 553 setoff, a creditor claiming recoupment need not apply for stay relief, because the "funds subject to recoupment are not the debtor's property." *In re Malinowski,* 156 F.3d 131, 133 (2nd Cir.1998).

 "Recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *University Medical Center,* at 1079. Thus, as long as a "creditor's claim arises out of the identical transaction as the debtor's, that claim may be offset against the debt owed to the debtor, without concern for the limitations put on the doctrine of setoff by Code section 553." *Id.* at 1080. In the context of bankruptcy, recoupment has been applied "primarily where the creditor's claim against the debtor and the debtor's claim against the creditor arise out of the same contract." *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir.1984). It has also been applied, albeit less often, in cases involving social welfare benefits. *Id.*

The Third Circuit has examined the doctrine of recoupment in the context of Medicare payments and social security benefits, but not unemployment compensation benefits. The Third Circuit has adopted an "integrated transaction test" to determine whether benefits arise from the same transaction for purposes of recoupment. *See Lee,* 739 F.2d at 875; *University Medical Center,* 973 F.2d at 1081.

 The integrated transaction test requires more than a mere logical relationship for two events to qualify as arising

out of the same transaction. *Id.* More specifically,

> [f]or the purposes of recoupment ... the fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, ... does not mean that the two arose from the same transaction. Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations.

*Id.*

In *Lee v. Schweiker,* the Third Circuit held that the Social Security Administration ("SSA") could not recoup pre-petition overpayments post-petition without violating the debtor's stay. *Lee,* 739 F.2d at 876. In that case, Lee received overpayments of social security benefits in 1980. *Id.* at 872. Upon discovery of the overpayment, the SSA began deducting the overpayment amount from Lee's monthly benefits. *Id.* Three months later, unbeknownst to the SSA, Lee filed for bankruptcy. *Id.* The SSA continued to deduct the overpayment after Lee's automatic stay was in place. *Id.*

In holding that the SSA violated Lee's stay, the court distinguished between contract recoupment cases and social welfare benefit recoupment cases. *Id.* at 876 ("The courts have generally taken a different approach in dealing with government benefits to individuals, such as social security."). More specifically, the court noted that "[s]ocial welfare payments, such as social security, are statutory 'entitlements' rather than contractual rights." *Id.* The court further noted that the primary purpose of such payments is to provide income security to qualifying recipients. *Id.* Finally, the court noted that:

> Although the paying agency can ordinarily recover overpayments ... the

Bankruptcy Code protects a debtor's future income from such claims once a petition has been filed, and the SSA violated the automatic stay in continuing to withhold part of Lee's benefits after she had filed her petition. *Id.*

In *University Medical Center*, the Third Circuit examined a contract recoupment case. In that case, the Department of Health and Human Services ("HHS") withheld post-petition Medicare reimbursement payments from the debtor, University Medical Center ("UMC"), and applied them to its UMC's pre-petition overpayment. *Id.* at 1069. The court held that HHS improperly recouped the payments in violation of UMC's § 362 stay. *Id.* Relying on Medicare regulations, the court determined that UMC's pre-petition debt and its post-petition services did not arise from the same transaction. It noted that the regulations indicated that "reimbursement payments made for any one year [arose] from transactions wholly distinct from reimbursement payments made for subsequent years." *Id.* at 1080. The court further postulated that to find that the 1995 overpayment and the 1998 services rendered arose from the same transaction for the purposes of recoupment "would be to contort that doctrine beyond any justification for its creation." *Id.* at 1082.

The first court to discuss recoupment of unemployment compensation benefits was the Bankruptcy Court for the Western District of New York in *In re Maine*, 32 B.R. 452 (Bankr.W.D.N.Y.1983). In that case, the New York State Department of Labor ("NYDOL") filed a proof of claim in the debtor's case for overpayment of fraudulently received unemployment benefits. *Id.* at 453. The NYDOL also declared that the debtor was ineligible for benefits until his overpayment was paid in full. *Id.* Although the debtor had not reapplied for benefits, he challenged the NYDOL's future withholding of benefits as violating his stay. *Id.*

The *Maine* court held that the NYDOL was entitled to recoup the overpayment from the debtor by withholding future unemployment benefits. *Id.* at 455. In so holding, the court found that although the New York statute did not provide for recoupment of overpayments, the NYDOL's right to recoup overpayments was implicit in the statute. *Id.* at 454. The court also determined that the receipt of unemployment compensation benefits establishes a "societal contract" of sorts between the state and the recipient. *Id.* at 455. The court noted that state unemployment insurance law "establishes a continuing and ongoing relationship, and that recovery of overpayments from future benefits [is] an exercise of the State's common law right of recoupment." *Id.* The court further noted that although the NYDOL's claim would be discharged upon completion of the debtor's chapter 13 plan, the state's right to recoupment would survive. *Id.*

The Eastern District of Missouri adopted the *Maine* court's societal contract theory in *In re Ross*, 104 B.R. 171 (E.D.Mo.1989). In that case, Ross applied for and received unemployment compensation benefits in 1983. *Id.* at 172. In 1984, the Missouri Division of Employment Security ("MDES") discovered that Ross had obtained her 1983 benefits fraudulently and assessed her with an overpayment. *Id.* Thereafter, Ross filed for chapter 13 bankruptcy. *Id.* In 1985, she filed for unemployment benefits again. *Id.* Instead of paying Ross her 1985 unemployment benefits, MDES recouped the funds in satisfaction of its 1983 overpayment. *Id.*

In holding that MDES properly recouped the overpayment from Ross, the court criticized the bankruptcy court for

relying on the Third Circuit's decision in *Lee v. Schweiker*, instead of relying on the Bankruptcy Court for the Western District of New York's decision in *In re Maine*. *Id.* at 173. In so criticizing, the court noted that the bankruptcy court "failed to adequately reconcile the distinction between the nature of the benefits at issue...." *Id.* The court noted that "[u]nemployment compensation benefits, unlike social security benefits, are not the product of an employee's labor or the result of his individual contributions." *Id.* It also noted that "a debtor does not have a property right in the unemployment compensation the same way she would in her social security benefits, which she contributed to individually." *Id.* "Moreover, a debtor should not simply be permitted to avoid her pre-petition obligation to repay fraudulently obtained benefits by filing for bankruptcy and then filing a new claim for unemployment compensation." *Id.*

Although the court found that MDES properly recouped the overpayment, the court also noted that a hardship could occur "when an unemployed bankrupt would have to forego this sole subsistence as a penalty for receiving excess payments for earlier claims, especially when the overpayments might have occurred a long time before. Equity demands some compromise." *Id.* In that vein, the court convinced MDES not to proceed against Ross for the balance of the overpayment (presumably allowing it to retain the money it already recouped). *Id.* MDES also made plans to file a request with the bankruptcy court for recoupment relief in the future. *Id.*

In *In the Matter of Gaither*, 200 B.R. 847 (Bankr.S.D.Ohio 1996), the court adopted the societal contract theory outlined in *Maine*. *Id.* at 852. In that case, the debtors obtained unemployment benefits in 1994 and 1995 through fraudulent misrepresentations. *Id.* at 848. The Ohio

Bureau of Employment Services ("OBES") charged debtors with an overpayment and ordered that any future benefits be applied to the overpayment until it is paid in full. *Id.* In 1995, the debtors filed for chapter 13 bankruptcy. *Id.* After filing, the debtors submitted a new claim for benefits. *Id.* The OBES withheld the benefits and applied them to its 1994 and 1995 overpayments, pursuant to an Ohio statute. *Id.*

In adopting the societal contract theory, the *Gaither* court noted that "the terms of the societal contract for unemployment benefits are set forth in the Ohio Unemployment Compensation Act, which specifically provides for the recoupment of fraudulently obtained benefits." *Id.* at 852–53.

The court in *In re Stratman*, 217 B.R. 250 (Bankr.S.D.Ill.1998), also elected to follow the *Maine* court's societal contract theory. In that case, the debtor filed a claim for unemployment benefits in 1993. *In re Stratman*, 217 B.R. 250, 251 (Bankr. S.D.Ill.1998). In 1994, the Missouri Division of Employment Security ("MDES") discovered that the debtor had been employed in 1993, and determined that she was overpaid benefits in the amount of $953.00, due to a willful failure to disclose earned income in 1993. *Id.* In 1995, the debtor and her husband filed for chapter 13 bankruptcy. *Id.* at 252. In 1997, the debtor became unemployed and filed for unemployment benefits again. *Id.* Pursuant to the Missouri unemployment compensation statute, MDES applied the debtor's benefits to its 1993 overpayment. *Id.*

The *Stratman* court held that MDES properly withheld debtor's post-petition unemployment benefits because the pre-petition overpayment and post-petition benefits arose from the same transaction. *Id.* In so holding, the court noted that "the right to recoupment arises within the statutory scheme established" in Missouri, and that "there is a logical relationship

between payment of Missouri unemployment benefits and the recovery of Missouri unemployment benefit overpayments. *Id.* Accordingly, the two arise from the same transaction." *Id.* at 253 (*citing In re Ross,* 104 B.R. 171 (E.D.Mo.1989); *Matter of Gaither,* 200 B.R. 847 (Bankr.S.D.Ohio 1996); *In re Maine,* 32 B.R. 452 (Bankr. W.D.N.Y.1983)).

Finally, in *In re Adamic,* 291 B.R. 175 (Bankr.D.Colo.2003), the Bankruptcy Court for the District of Colorado also held that the Colorado Department of Labor ("CDOL") properly recouped the debtor's post-petition unemployment benefits. *In re Adamic,* 291 B.R. 175, 184 (Bankr. D.Colo.2003). In that case, the debtor collected unemployment benefits in 1993. *Id.* at 178. In 1994, the CDOL discovered that the debtor was employed in 1993. *Id.* The CDOL concluded that he had received the 1993 payments by false representation and assessed a penalty. *Id.* The debtor did not appeal. *Id.* Thereafter, the debtor filed for chapter 13 bankruptcy. *Id.* at 179. He listed the CDOL's overpayment claim in his Schedule F, and the CDOL filed a proof of claim. *Id.* The debtor lost his job in 2002 and applied for unemployment compensation benefits. *Id.* The CDOL applied all of the debtor's 2002 benefits to its 1993 overpayment, because the debtor had "caused the overpayment by willfully giving false information or consciously holding back information." *Id.*

The *Adamic* court seemingly adopted the Third Circuit's integrated transaction test, noting that the doctrine of recoupment "is only applicable to claims that are so closely intertwined that allowing the debtor to escape [his or her] obligation would be inequitable notwithstanding the Bankruptcy Code's tenet that all unsecured creditors share equally in the debtor's estate." *Id.* at 182. Following the integrated transaction test, the court found that the debtor's pre-petition overpayment liability and his post-petition benefits arose from the same transaction. *Id.* at 184. More specifically, the court relied on the fact that Colorado's statute "conditioning receipt of current benefits on recovery of prior overpayments is expressly authorized by Congress,[3] as is denial of claims for benefits where state eligibility requirements have not been met." *Id.*

Going one step further than the other courts that have discussed this issue, the *Adamic* court found that irrespective of whether the CDOL improperly recouped the debtor's benefits, it did not violate the debtor's stay, because "the post-petition benefits are neither property of the Debtor nor property of the estate." *Id.* at 185. The court found that "[b]ecause the Debtor is not entitled to receive unemployment compensation under state law due to his prior fraud and/or failure to disclose a material fact, he never 'acquired' the post-petition payments and those payments do not constitute 'earnings for services performed.'" *Id.* at 187. Finally, the *Adamic* court noted that its decision differs from the Third Circuit's decision in *Lee* and

---

**3.** The court criticized the *Malinowski* court for failing to recognize that state unemployment statutes implement a federal program, and that federal statutes contemplate state statutes that "may terminate, deny, suspend or reduce any benefits for unemployment compensation in certain circumstances." *Id.* at 184. The court pointed to two federal statutes allowing a state to recoup overpayments-the Social Security Act and the Federal Unemployment Tax Act. The Social Security Act permits states to "deduct from unemployment benefits otherwise payable to an individual under an unemployment benefit program of the United States or of any other State, and not previously recovered." 42 U.S.C. § 503(g) (2004). The Federal Unemployment Tax Act permits states to deduct amounts "from unemployment benefits and used to repay overpayments as provided in section 503(g) of the Social Security Act." 26 U.S.C. § 3304(a)(4)(D) (2004).

notes that it agrees with other courts that have determined that a debtor does not have a property right in unemployment benefits like he or she does in social security benefits, because the latter benefits are statutory entitlements. *Id.* at 187.

■ Courts must also consider the equities of each case and in the absence of fraud recoupment may not be equitable. In *In re Malinowski,* 156 F.3d 131 (2nd Cir.1998), the Second Circuit reached a different conclusion than the *Maine* and *Ross* courts. In that case, pursuant to an initial determination of eligibility, the debtor collected unemployment benefits. *Id.* at 132. Later, the New York Department of Labor ("NYDOL") determined that the debtor was ineligible because he had voluntarily left his employment and without good cause. *Id.* The NYDOL charged the debtor with the overpayment. *Id.* Thereafter, the debtor filed for chapter 13 bankruptcy. *Id.* The following year, the debtor filed for unemployment benefits again. *Id.* The NYDOL did not file a proof of claim in the debtor's case, but instead withheld his post-petition benefits to satisfy its pre-petition overpayment. *Id.*

The *Malinowski* court held that the NYDOL improperly recouped its overpayment in violation of the debtor's stay. In so holding, the court found that the pre-petition overpayment and the post-petition qualification for benefits did not arise from the same transaction, because "the two claims for unemployment benefits were based upon different episodes of unemployment." *Id.* at 134. Also, the court noted that the New York statute governing unemployment benefits required the debtor to have worked in the preceding year to qualify for benefits in the following year. *Id.* Further, the court noted that

although "[t]he worker was the same, the agency was the same, the law was the same ... the claims arose from different sets of facts, each complete in itself." *Id.* Additionally, the court found it significant that "the two periods of employment were separated by the filing of a petition for bankruptcy." *Id.* at 135. Moreover, the court rejected the societal contract theory postulated by the *Maine* court in favor of the Third Circuit's social welfare benefits theory. *Id.* at 135.[4] Finally, the court found that "in light of the equitable nature of the recoupment remedy, the facts in the particular case are important. The Department asks us to take away the unemployment insurance safety net from a debtor in bankruptcy who has not been accused of willful wrongdoing in connection with the overpayment." *Id.* The court found that the lack of fraud in this case distinguished it "from *Maine* and others in which the government was permitted to recoup overpayments resulting from fraud." *Id.*

■ As the Third Circuit has not examined recoupment in the context of unemployment benefits the Court looks to the other Circuits for guidance on the issue. The Court finds the applicable law as follows: State Departments of Labor are entitled to recoup fraudulently received unemployment compensation benefits against future benefits. *In re Ross,* 104 B.R. 171 (E.D.Mo.1989); *In re Maine,* 32 B.R. 452 (Bankr.W.D.N.Y.1983); *In the Matter of Gaither,* 200 B.R. 847 (Bankr. S.D.Ohio 1996); *In re Adamic,* 291 B.R. 175 (Bankr.D.Colo.2003). Recoupment is justified because unemployment compensation is a societal contract and not an entitlement. *See In re Maine,* 32 B.R. at 455; *In re Ross,* 104 B.R. at 173.

---

4. The court, however, did not explain how or why unemployment benefits constitute social welfare benefits.

First, as the *Adamic* court noted, states are authorized to recoup overpayments of unemployment benefits pursuant to federal statutes, such as the Social Security Act and the Federal Unemployment Tax Act. Second, unlike social security benefits, individuals do not contribute personally to unemployment benefit funds, they contribute minimal amounts to an unemployment insurance fund. This fund is a form of social insurance or a societal contract. The Debtor does not have a property right in unemployment benefits in the same way as social security benefits because they are not statutory entitlements. Also, unlike unemployment benefit claimants, social security benefit claimants cannot be disqualified from receiving benefits.[5]

Thus, unemployment benefits are distinguishable from social security benefits in that they are not clearly recognizable as social welfare benefits. Third, the majority of cases dealing with recoupment of unemployment benefits have found that recoupment was proper. Only one case found that recoupment was improper—*Malinowski*. The *Malinowski* case is distinguishable from this case in that there was no finding of fraud. In this case, as in the *Ross, Maine, Gaither,* and *Adamic* cases, there was a finding of fraud. Fourth, like the statutes in Colorado, Missouri, and Ohio, New Jersey's unemployment compensation benefits

statute provides for recoupment of overpayments obtained through fraud.[6]

Finally, New Jersey courts have supported the statute's recoupment provisions. More specifically, the courts note that the recoupment provisions of New Jersey's statute are "designed to preserve the Unemployment Trust Fund for the payment of benefits to those individuals entitled to receive them." *Bannan v. Board of Review,* 299 N.J.Super. 671, 674, 691 A.2d 895, 897 (1997). New Jersey courts also note that the State has the responsibility "to serve not only the interests of the individual unemployed, but also the interests of the general public." *Id.* "The public interest clearly is not served when the Unemployment Trust Fund is depleted by failure to recoup benefits erroneously paid to an unentitled recipient, however blameless he or she may have been." *Id.* The courts further note that the fact that the "individual suffers a hardship is unfortunate, but it is necessary to preserve the ongoing integrity of the unemployment compensation system." *Id.* at 675, 691 A.2d at 897.

Based on the foregoing, and in light of the purpose of New Jersey's unemployment compensation statute, the Court adopts the societal benefits theory with regard to recoupment of unemployment benefits. Accordingly, the Debtor's 1993 overpayment and 2004 benefits arose from

---

5. Individuals who fraudulently obtain social security benefits can be convicted of a felony and imprisoned and/or fined. They cannot, however, be disqualified from receiving benefits. *See* 42 U.S.C. § 408 (2004). *Cf. with* N.J. Stat. § 43:21–5 (2004).

6. "When it is determined that a person has obtained benefits fraudulently or through misrepresentation, such person shall be liable to repay those benefits in full. The sum shall be deducted from any future benefits payable to the individual under this chapter." N.J. Stat. § 43:21–16(d)(1) (2004).

It should be noted that New York's statute, followed in the *Malinowski* case, provides that a claimant who wilfully makes a false statement or representation "shall forfeit benefits for at least the first four but not more than the first eighty effective days following discovery of such offense for which he otherwise would have been entitled to receive benefits." NY CLS Labor § 594 (2004). Thus, unlike New Jersey's statute, the New York statute does not expressly provide for recoupment.

the same transaction for purposes of recoupment. As such, the NJDOL properly recouped the Debtor's 2004 benefits. The NJDOL did not violate the Debtor's stay because the doctrine of recoupment operates outside of a debtor's § 362 stay.

■ However, considering that recoupment is an equitable remedy, the Court must examine the facts of each case with particularity. In the case at bar, the Debtor fraudulently obtained unemployment benefits, but the overpayments occurred years before the Debtor filed for bankruptcy protection. Unemployment benefits, like social security benefits, are designed to provide a claimant with income security in the event that he or she loses his or her job. As such, the Court holds that the NJDOL was entitled to recoupment but it is limited to the amount already recouped. No further offsets are permitted. The Debtor has completed all payments required under his Plan. Accordingly, the remainder of the NJDOL's claim is discharged.

### CONCLUSION

Based on the foregoing, the Court denies the Debtor's motion to lift attachment of unemployment benefits in violation of his stay because the NJDOL properly recouped its overpayment, and, as such, is not in violation of the Debtor's stay. However, the NJDOL's recoupment is limited to $2,961.85, and the remainder of its claim is discharged upon the completion of the Debtor's chapter 13 plan.