

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-24-2005

# In Re: United

Precedential or Non-Precedential: Precedential

Docket No. 03-4768

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"In Re: United " (2005). *2005 Decisions.* Paper 1532.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1532

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-4768

———

IN RE: UNITED HEALTHCARE SYSTEM, INC., Debtor

THE RECONSTITUTED COMMITTEE OF
UNSECURED CREDITORS OF THE UNITED HEALTHCARE
SYSTEM, INC.,

Appellant

v.

STATE OF NEW JERSEY DEPARTMENT OF LABOR

———

On Appeal from the United States District Court
for the New Jersey
(D.C. Civ. No. 03-01024)
District Judge: Honorable Joseph A. Greenaway, Jr.

———

Argued October 28, 2004

Before: SCIRICA, Chief Judge, FISHER, and
GREENBERG, Circuit Judges.

(Filed January 24, 2005)

———

Dennis J. O'Grady (argued)
J. Alex Kress
Riker, Danzig, Scherer, Hyland & Perretti
One Speedwell Avenue
Headquarters Plaza
Morristown, NJ 07962

Attorneys for Appellant

Peter C. Harvey
Attorney General of New Jersey
Patrick DeAlmeida
Assistant Attorney General
Mala S. Narayanan (argued)
Deputy Attorney General
Office of Attorney General of New Jersey
Department of Law & Public Safety
Richard J. Hughes Justice Complex
Trenton, NJ 08625

    Attorneys for Appellee

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

On this appeal, we must determine whether a non-profit organization's obligation to reimburse the New Jersey Department of Labor ("NJDOL") for unemployment compensation benefits NJDOL paid to its former employees is an "excise tax" under the Bankruptcy Code. United Healthcare System, Inc. ("United") was a non-profit healthcare services corporation that owing to its non-profit status under New Jersey law was permitted to elect to reimburse NJDOL retrospectively for any unemployment compensation benefits NJDOL actually paid to its former employees. United elected to pursue this reimbursement option instead of paying the quarterly unemployment contribution payments New Jersey law requires of most New Jersey employers. Following this election, United filed for bankruptcy. Both before and after United's bankruptcy filing, NJDOL paid unemployment compensation benefits to former United employees. NJDOL believes that its claim for reimbursement for the benefits it paid is entitled to priority under 11 U.S.C. § 507(a)(8)(E) which grants a priority to claims for excise taxes. The bankruptcy court and the district court agreed with NJDOL. For the reasons we explain below, we conclude that NJDOL's reimbursement claim is not entitled to priority under section 507(a)(8)(E) because the reimbursement obligation is not a tax for bankruptcy purposes under

2

that section. We therefore will reverse.[1]

# I. FACTUAL AND PROCEDURAL BACKGROUND

There are no relevant facts in dispute on this appeal. United, which operated as the Children's Hospital of New Jersey, provided healthcare services in New Jersey. It obviously had financial difficulties as it filed a bankruptcy petition seeking reorganization under Chapter 11 of the Bankruptcy Code on February 19, 1997, and then on March 8, 1997, terminated the employment of most of its employees. NJDOL processed and, where appropriate, paid the unemployment compensation claims of United's former employees. Because United had elected to reimburse NJDOL for unemployment benefits actually paid rather than to make quarterly contributions to the state unemployment compensation fund, NJDOL sought repayment of the benefits it paid to former United employees. United, however, did not reimburse NJDOL for substantial benefits it paid on United's behalf.

As a part of United's reorganization plan, the appellant, Reconstituted Committee of Unsecured Creditors of United Healthcare System, Inc. ("the Committee"), succeeded to various rights and duties of United. In the bankruptcy proceedings, NJDOL submitted claims for the unemployment benefits it paid to former United employees for which it had not been reimbursed. NJDOL sought $941,302.30 (including interest) as reimbursement for unemployment benefits NJDOL paid to United employees whose employment United terminated "pre-petition" (prior to the filing of the bankruptcy petition).[2] NJDOL also sought reimbursement for unemployment compensation benefits it paid to United employees whose employment United terminated after the bankruptcy filing.

---

[1]In two earlier cases we made determinations arising from United's bankruptcy but neither is related to this case. In re United Healthcare Sys., Inc., 200 F.3d 170 (3d Cir. 1999); In re United Healthcare Sys., Inc., 185 F.3d 863 (3d Cir. 1999) (table).

[2]The addition of other unpaid "pre-petition" obligations brought NJDOL's total pre-petition based claim to $1,156,170.00, but these other pre-petition obligations are not subject to this appeal.

With interest, this "post-petition" claim amounted to $8,223,160.94.[3] NJDOL sought priority status for both the pre-petition and post-petition claims under section 507(a)(8)(E). The Committee objected to the granting of priority status for these claims, arguing that they should be classified as general unsecured claims.

On December 30, 2002, the bankruptcy court concluded that these pre-petition and post-petition reimbursement claims were entitled to priority as excise taxes under section 507(a)(8)(E).[4] In re United Healthcare Sys., Inc., 282 B.R. 330 (Bankr. D.N.J. 2002). The Committee appealed from this order to the district court which, by an unpublished order on November 13, 2003, affirmed without opinion the bankruptcy court's order. On December 12, 2003, the Committee appealed to this court.

## II. JURISDICTION AND STANDARD OF REVIEW

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(b) and 1334. The district court had appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1) and we have jurisdiction under 28 U.S.C. §§ 158(d) and 1291. Exercising the same standard of review as the district court, "[w]e review the bankruptcy court's legal determinations de novo, its factual findings for clear error and its exercise of discretion for abuse thereof." In re Trans World Airlines, Inc., 145 F.3d 124, 130-31 (3d Cir. 1998) (citing In re Engel, 124 F.3d 567, 571 (3d Cir. 1997), and Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc., 57 F.3d 1215, 1223 (3d Cir. 1995)). Inasmuch as the parties agree that there are no relevant facts in dispute, our review encompasses only the legal determinations of the

---

[3]NJDOL also claimed priority status for $79,266.90 resulting from post-petition obligations based on the employment of a few employees after United ceased its operations. The bankruptcy court held that this claim deserved priority status as an administrative expense incurred by the bankruptcy estate, a determination not challenged on this appeal.

[4]The bankruptcy court determined, however, that NJDOL's claim for reimbursement of these payments should not be classified as an employment tax under 11 U.S.C. § 507(a)(8)(D), nor as an administrative expense (except for the $79,266.90 described in supra note 3). These determinations are not at issue on this appeal.

4

bankruptcy court as affirmed by the district court. We will employ a de novo review of those legal determinations.


## III. DISCUSSION

### A. A Non-Profit Employer's Reimbursement Obligation Under New Jersey Law

New Jersey law requires most employers to make quarterly contributions to the state's Unemployment Compensation Fund. N.J. Stat. Ann. § 43:21-7 (West 2004).[5] This standard statutory obligation requires an employer to make quarterly contributions to the fund, regardless of whether the state has paid or will pay unemployment benefits to its former employees. See id. We have classified an employer's obligation to make state unemployment compensation contributions as a tax for bankruptcy purposes. In re Wm. Akers, Jr., Co., 121 F.2d 846, 851 (3d Cir. 1941); see also Sipe v. Amerada Hess Corp., 689 F.2d 396, 402 (3d Cir. 1982) (stating that "it cannot be seriously disputed that the unemployment compensation and disability benefits contributions mandated by New Jersey law are 'taxes' within the meaning of the Tax Injunction Act").

Our inquiry, however, does not end with our recognition of the status of unemployment compensation contributions thereby permitting us to affirm the district court's order affirming the bankruptcy court. We cannot do so because, as a non-profit employer, United did not make contributions and thus we are concerned only tangentially with the status of contributions. Instead, as we have indicated it opted, pursuant to N.J. Stat. Ann. § 43:21-7.2 (West 2004), to reimburse NJDOL for any unemployment compensation benefits NJDOL actually paid to former United employees.[6] This

---

[5]Section 43:21-7 reads, in relevant part, "[e]mployers other than governmental entities, whose benefit financing provisions are set forth in section 4 of P.L. 1971, c. 346 (C. 43:21-7.3), and those nonprofit organizations liable for payment in lieu of contributions on the basis set forth in section 3 of P.L. 1971, c. 346 (C. 43:21-7.2), shall pay to the controller for the unemployment compensation fund, contributions . . . ."

[6]Section 43:21-7.2 provides, "[n]otwithstanding any other provisions of the Unemployment Compensation Law, for payments of

provision presents non-profit employers with a choice as it provides that a non-profit employer either "shall pay contributions" to the fund or elect to reimburse NJDOL for benefits actually paid to former employees in lieu of contributions.

This statutorily-provided choice brings New Jersey law in compliance with the Federal Unemployment Tax Act ("FUTA"), 26 U.S.C. § 3301 et. seq., which established a federal "excise tax" equal to a certain percentage of the total wages paid by an employer in a calendar year. 26 U.S.C. § 3301. An employer's FUTA obligation is calculated based on "employment," as that term is defined in the Act. Service performed for a non-profit organization classified as such under the federal income taxation statutes is excepted, however, from the term "employment" for federal unemployment tax purposes. 26 U.S.C. § 3306(c)(8).[7] Wages paid for services performed in the employment of a qualifying non-profit organization, therefore, do not give rise to any federal unemployment tax.

In addition to establishing the federal unemployment tax, FUTA governs many aspects of state unemployment compensation systems, including how state unemployment compensation laws treat non-profit organizations. Each state must provide organizations exempted from federal unemployment tax pursuant to 26 U.S.C. § 3306(c)(8) with the opportunity to elect to make reimbursement payments in lieu of contributions. 26 U.S.C. § 3309(a). Accordingly, as we have explained, New Jersey has provided qualifying non-profit organizations with this option.

---

contributions by employers, benefits paid to individuals in the employ of nonprofit organizations . . . shall be financed in accordance with the following provisions . . . ." Additionally, N.J. Stat. Ann. § 43:21-19(f) (West 2004) provides separate definitions for "contributions" and for "payments in lieu of contributions." "Contributions" is defined as "the money payments to the State Unemployment Compensation Fund. . . ." Id. "Payments in lieu of contributions" is defined as "the money payments to the State Unemployment Compensation Fund by employers electing or required to make payments in lieu of contributions . . . ." Id.

[7]New Jersey law does not except service to a non-profit employer from its definition of "employment." See N.J. Stat. Ann. § 43:21-19(i) (West 2004).

6

B. Classification of a New Jersey Non-Profit Employer's
Reimbursement Obligation under the Bankruptcy Code

The Bankruptcy Code provides priority status to certain claims. 11 U.S.C. § 507. Unsecured claims of governmental units may be entitled to priority, but only if the statute expressly grants priority to the type of claim asserted. 11 U.S.C. § 507(a)(8) (providing that "[t]he following expenses and claims have priority in the following order: . . . (8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for--"). Section 507(a)(8)(E) affords priority status to an unsecured claim of a governmental unit to the extent it is for:

> an excise tax on – (i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or (ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition.

The bankruptcy court determined, and the district court agreed, that NJDOL's claims for reimbursement of the unemployment benefits it paid to United's former employees are claims for excise taxes afforded priority under section 507(a)(8)(E).

The Committee argues that the bankruptcy court and the district court erred in determining that the reimbursement obligation is an excise tax under section 507(a)(8)(E) because they failed to recognize that federal and New Jersey unemployment compensation laws distinguish between for-profit and non-profit employers and establish different obligations for each. The Committee argues that the obligation reserved for non-profit employers creates a debt obligation, and is not a tax. Conducting its own analysis of the non-profit obligation, the Committee concludes that the non-tax characteristics of the obligation outweigh any of its characteristics suggesting it is a tax. The Committee alternatively argues that if the obligation is a tax for bankruptcy purposes, it is not an excise tax, and even if it is an excise tax, it is not the type of excise tax entitled to priority under section 507(a)(8)(E).

On the other hand, NJDOL contends that the bankruptcy and

7

district courts ruled correctly. Emphasizing the close relationship between reimbursement payments and unemployment compensation contributions, it argues that they are functional equivalents; that the reimbursement option is simply an alternative method to pay a tax. To support this argument, NJDOL points out that if a non-profit employer does not elect the reimbursement alternative, it is liable to make contributions. NJDOL also argues that because federal unemployment taxes are considered excise taxes, and given the close relationship between federal unemployment taxes and state unemployment taxes, the reimbursement payments also must be excise taxes. In summary, NJDOL concludes that the tax-like characteristics of the reimbursement payments predominate. Responding to the Committee's alternative argument, NJDOL argues that the reimbursement obligation precisely fits into the excise tax category contained in section 507(a)(8)(E).

## 1. Definition of "Excise Tax" Under the Bankruptcy Code

For us to affirm the order of the district court and thus uphold the reasoning or at least the order of the bankruptcy court, we must agree that the obligation to reimburse NJDOL is characterized properly as an excise tax as that term is used in the Bankruptcy Code. A determination whether the obligation is a tax, excise or otherwise, is implicit in the determination of whether an obligation is an excise tax.[8]

The Bankruptcy Code does not define "tax," "excise" or "excise tax." United States v. Reorganized CF&I Fabricators of Utah, Inc., 518 U.S. 213, 220, 116 S.Ct. 2106, 2111 (1996). Nonetheless when necessary a court determines under federal law whether an obligation is a "tax" for bankruptcy purposes. City of New York v. Feiring, 313 U.S. 283, 285, 61 S.Ct. 1028, 1029 (1941); State of New Jersey v. Anderson, 203 U.S. 483, 491-92, 27 S.Ct. 137, 140 (1906). When state law, however, creates the obligation at issue, a court looks to that law to ascertain its attributes so that the court can determine its characterization under federal bankruptcy law. Feiring, 313 U.S. at 285, 61 S.Ct. at 1029.

---

[8]Because we determine that the reimbursement obligation at issue is not a tax, we need not address the Committee's argument that even if the obligation is a tax, it is not an excise tax or the kind of excise tax entitled to priority.

8

In Anderson, the State of New Jersey sought priority status for payments, alleged to be franchise taxes, owed to the state. Distinguishing between taxes and contractual debts, the Supreme Court determined that "[g]enerally speaking, a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the government." 203 U.S. at 492, 27 S.Ct. at 140. Based on that characterization, the Supreme Court determined that the obligation owed to the state was, in fact, a franchise tax deserving priority. Id. at 493, 27 S.Ct. at 140. The Court stated that "this imposition is in no just sense a contract. The amount to be paid, fixed by the statute, is subject to control and change at the will of the state." Id. The Supreme Court later relied on the Anderson definition of a tax to determine that the obligation to pay sales tax qualified as a tax deserving priority status. Feiring, 313 U.S. at 287-88, 61 S.Ct. at 1030-31. The Court determined that "[a] pecuniary burden so laid upon the bankrupt seller for the support of government, and without his consent thus has all the characteristics of a tax entitled to priority." Id. at 287, 61 S.Ct. at 1030.

The Court decided Anderson and Feiring at a time when the priority treatment of government obligations was broader than now under bankruptcy law.[9] Today, a government obligation must fall under one of the specific categories of section 507(a)(8) to receive priority. Since Anderson and Feiring, courts have attempted to formulate and apply a definition of "tax" that recognizes the precedent of Anderson and Feiring but also accommodates the evolution of the law governing priority of government obligations.

The bankruptcy court applied the tests resulting from what we believe are the three most frequently cited courts of appeals decisions to have engaged in this process, In re Lorber Industries of California, Inc., 675 F.2d 1062 (9th Cir. 1982), In re Suburban Motor Freight, Inc., 998 F.2d 338 (6th Cir. 1993) ("Suburban I"),

---

[9]In Anderson, the Court explained that the version of the Bankruptcy Act in operation granted priority status to "all taxes legally due and owing by the bankrupt to the United States, state, county, district, or municipality." Anderson, 203 U.S. at 487-88, 27 S.Ct. at 138. The Supreme Court decided Feiring during the operation of the Bankruptcy Act as amended in 1938. At that time, the Act awarded priority status to "taxes legally and owing by the bankrupt to the United States or any State or any subdivision thereof." Feiring, 313 U.S. at 285, 61 S.Ct. at 1029.

9

and In re Suburban Motor Freight, Inc., 36 F.3d 484 (6th Cir. 1994) ("Suburban II").  In Lorber, the Court of Appeals for the Ninth Circuit faced the issue whether sewer use fees constituted taxes entitled to priority.  Building on the "pecuniary burden laid upon individuals or property for the purpose of supporting the government" standard the Supreme Court established in Anderson, the court developed a four-part test to determine whether an obligation is a tax for bankruptcy purposes:  (1) "an involuntary pecuniary burden, regardless of name, laid upon individuals or property"; (2) "imposed by, or under authority of the legislature"; (3) "for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it"; (4) "under the police or taxing power of the state."  Lorber, 675 F.2d at 1066 (quoting Dungan v. Dep't of Agric., State of California, 332 F.2d 793 (9th Cir. 1964)).  When the court applied this test to the sewer use fees at issue, it determined they were more like non-tax fees or a contractual debt than a tax.  Lorber, 675 F.2d at 1067.  The court observed that the use fees were assessed proportionately to use, and concluded that because the charges resulted from the voluntary act of producing wastewater for disposal, they were classified better as debt.[10]  Id.  The court determined that its characterization of the use fees as contractual debt was consistent with the history and purpose of the bankruptcy laws, which had narrowed the reach of the priority tax category over time.  Id. at 1067-68.

In Suburban I the Court of Appeals for the Sixth Circuit was dissatisfied with the four-part Lorber test and sought to narrow its reach.  The court found the Lorber test to be overly broad, determining that its factors did not significantly narrow the pool of government obligations that could be characterized as taxes.  Concerned that courts were relying too heavily on the "public purpose" Lorber factor, the court observed that if that factor is determinative, all money collected by the government would qualify as a "tax" because all money collected by the government is used for public purposes in some way.  Suburban I, 998 F.2d at 341.  The court commented that "[t]he threat of the Lorber reasoning . . . is that the Government automatically wins priority for all money any debtor owes it, regardless of the nature of the payments."  Id.  Such an advantage could "eliminate all distinction between 'taxes' and

---

[10]It must be acknowledged that much the same thing could be said about sales taxes as the greater the purchases of taxable items or services the greater the tax owed.

10

'fees'" and would allow the government to "prevail consistently against private creditors with arguably equal claims."[11] Id. To address its concern that the Lorber test is overly broad, in Suburban II the court added two factors to the Lorber analysis: (1) whether the obligation is "universally applicable to similarly situated entities"; and (2) whether granting priority status to the government will "disadvantage private creditors with like claims." Suburban II, 36 F.3d at 488-89.

In Suburban I, the court determined that premium payments to Ohio's workers' compensation fund are taxes. After observing that the state law demanded compulsory payments and did not allow employers to purchase private insurance,[12] the court concluded that the additional factors it set forth to determine if an obligation is a tax had been satisfied and that the obligation in question was a tax for bankruptcy purposes. Suburban I, 998 F.2d at 342. The court stated, "[i]f the State had an optional participation program, or allowed employers to purchase private liability insurance, it would be unfair and without statutory justification to call state-collected premiums 'taxes' and put the [state] ahead in line while leaving unpaid private insurers to languish along with the rest of the unsecured creditors."[13] Id.

In Suburban II, the obligation before the court was money owed to the Ohio Bureau of Workers' Compensation for payments the Bureau made to workers' compensation claimants. Suburban II,

---

[11]Ironically, the government had lost in Lorber.

[12]Ohio law did permit employers to self-insure. Suburban I, 998 F.2d at 341.

[13]The Court of Appeals for the Fourth Circuit's opinion in New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund, 886 F.2d 714 (4th Cir. 1989), influenced the court in Suburban I. The Court of Appeals for the Sixth Circuit elected to follow the "relatively balanced approach" of New Neighborhoods. Suburban I, 998 F.2d at 341. In New Neighborhoods, the court determined that contributions to West Virginia's workers' compensation scheme are taxes. New Neighborhoods, 886 F.2d at 720. In reaching this conclusion, the court analyzed the nature of the obligation, considered its insurance-like characteristics, and also recognized that the bankruptcy laws limit the availability of priority claims.

11

36 F.3d at 486. These reimbursement payments were due to the Bureau because the employer failed to pay premiums and also failed to pay claims while it was self-insured. Id. The court refused to extend its holding in Suburban I, which afforded priority status to claims for unpaid premiums, to the obligation in Suburban II, which involved reimbursement claims. Id. at 487-88. After applying the Lorber test and the two additional factors derived from Suburban I, the court determined that because the employer's liability resulted solely from its default, the obligation failed the universality test of Suburban I. Id. at 489. Moreover, the court believed that classifying the obligation as a priority claim would disadvantage private creditors with like claims. Id.

The Supreme Court has considered whether an obligation is a tax in contexts other than bankruptcy. For example, the Court considered the nature of an obligation owed to a federal agency to allow it to recoup the cost of regulating a particular industry or activity. National Cable Television Ass'n, Inc. v. United States, 415 U.S. 336, 94 S.Ct. 1146 (1974). As the Court explained, the legislative power in enacting a tax may "disregard benefits bestowed by the Government on a taxpayer." Id. at 340, 94 S.Ct. at 1149. But a situation in which a "public agency may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society" is different. Id. at 340-41, 94 S.Ct. at 1149. See also In re Wm. Akers, Jr., Co., 121 F.2d at 850 (quoting with approval language explaining that taxes cannot be required to benefit taxpayers proportionately to their tax payments). Additionally, the government's ability to manipulate the assessment to encourage or discourage a certain activity is a characteristic of a tax. National Cable, 415 U.S. at 341, 94 S.Ct. at 1149.

Returning to the bankruptcy context, the Supreme Court, after Lorber and Suburban, again addressed the question of whether an obligation is a tax for bankruptcy purposes. In CF& I Fabricators, the Court considered whether a federally mandated payment equal to 10 percent of a pension plan funding delinquency is an excise tax under the bankruptcy laws.[14] CF& I Fabricators, 518 U.S. at 215,

---

[14]CF & I Fabricators arose under the pre-1994 Bankruptcy Code. Under that prior version of the Code, Congress granted excise taxes seventh priority under section 507. In 1994, Congress moved the provision to eighth priority, but did not alter the language of the provision. CF & I Fabricators, 518 U.S. at 216 n.1, 116 S.Ct. at 2109

116 S.Ct. at 2109. In reviewing <u>Anderson</u>, <u>Feiring</u> and other precedent addressing whether a particular obligation is a tax, but without commenting on the reasoning of <u>Lorber</u> or <u>Suburban</u>, the Court remarked that "in every one of those cases the Court looked behind the label placed on the exaction and rested its answer directly on the operation of the provision using the term in question." <u>Id</u>. at 220, 116 S.Ct. at 2111. Additionally, the Court observed that "[i]n each instance the decision turned on the actual effects of the exactions." <u>Id</u>. at 221, 116 S.Ct. at 2111. The Court recognized that it decided <u>Anderson</u> and <u>Feiring</u> before enactment of the 1978 Bankruptcy Code, but concluded that Congress did not reject the <u>Anderson-Feiring</u> reasoning in enacting the 1978 Code.[15] <u>Id</u>. at 224, 116 S.Ct. at 2113. Therefore, the Court proceeded to undertake a "functional examination" of the obligation at issue and concluded that its "obviously penal character" signaled that it was a penalty, and not a tax. <u>Id</u>. at 225, 116 S.Ct. at 2113-14.

We, of course, will follow the lead of the Supreme Court and accordingly will make a functional examination of the obligation at issue here that focuses on actual effects and looks behind labels while recognizing the precedent of <u>Anderson</u> and <u>Feiring</u>.[16] While

---

n.1.

[15]The Court recognized a "statement from the legislative history of the 1978 Act that '[a]ll Federal, State or local taxes generally considered or expressly treated as excise taxes are covered' by § 507(a)(7)(E)." The Court also recognized, however, that the obligation that was before it was not expressly called an excise tax and that whether the obligation is considered generally to be an excise tax was precisely the question before the Court. <u>CF & I Fabricators</u>, 518 U.S. at 223-24, 116 S.Ct. at 2112-13.

[16]Chief Judge Scirica in his dissenting opinion agrees that this functional examination is the appropriate analysis to employ to determine whether the reimbursement obligation is a tax for bankruptcy purposes. He focuses his functional examination, however, on whether the reimbursement obligation falls into one of four rigid categories: tax; debt; fee in exchange for a benefit; or a penalty. We believe that a broader, more fluid approach is necessary to conduct a true functional analysis. Our task is not to test whether the reimbursement obligation fits into one of those four categories precisely, though we do characterize the obligation as a debt, but to look behind labels and to examine the

the Lorber-Suburban analysis is helpful in executing this examination, we do not believe that its six factors should constrain our inquiry. We believe a functional examination that balances the characteristics of the obligation at issue will signal whether an obligation is a tax for bankruptcy purposes, and that an examination should be flexible enough to allow for consideration of any relevant factor. The problem with applying only the Lorber-Suburban six-factor test is that it may prove too rigid to provide an effective analysis of every potential obligation and thus could preclude consideration of important characteristics. Also, by employing a functional examination we preempt the concern that the Court of Appeals for the Sixth Circuit expressed that the Lorber test produces overly broad classification of claims as taxes. Moreover, our more flexible approach allows us to consider the characteristics of the obligation in light of the evolving treatment of priority claims under the Bankruptcy Code. We emphasize, however, that the Lorber and Suburban factors are helpful in undertaking this functional examination, and at times application of those factors alone sufficiently may answer the question whether a governmental obligation is a tax.

2. The Analysis of the Bankruptcy Court Regarding the Classification of a New Jersey Non-Profit Employer's Reimbursement Obligation under the Bankruptcy Code

The bankruptcy court applied the Lorber-Suburban factors to the reimbursement obligation option and concluded that it satisfied all six factors. The court stated, "[b]ecause United could not escape its statutory obligation to make payments to the Unemployment Compensation Fund, it was subject to an involuntary pecuniary burden imposed by the legislature as described in the Lorber test. United was only able to choose how to make the payments, not whether to make the payments." 282 B.R. at 337. The court determined with regard to the public purpose Lorber factor, that New Jersey enacted the unemployment compensation law for a public purpose because the fund arrangement protects the public against the evils associated with unemployment. The bankruptcy court further determined that the Suburban factors were met. The "universally applicable" factor was met because "New Jersey [law] requires all employers to make payments to the unemployment compensation fund." Id. at 338. The bankruptcy court also determined that there

operation of the statutory scheme.

14

were no private creditors with like claims because the unemployment compensation law does not "permit" employers to obtain private insurance to satisfy their obligations.[17]  Id.

The bankruptcy court recognized that the Court of Appeals for the First Circuit directly had addressed whether a non-profit employer's obligation to reimburse a state unemployment compensation fund amounted to an excise tax for bankruptcy purposes in In re Boston Regional Medical Center, Inc., 291 F.3d 111 (1st Cir. 2002) ("Boston Regional I").  In that case, the court reached a result opposite of that of the bankruptcy court here,[18] concluding that a non-profit employer's choice to make payments in lieu of contributions creates a kind of obligation different than a tax.  The court illuminated a distinction between the obligation to make quarterly contributions and the obligation to reimburse for benefits actually paid.  Employers reimbursing the state are not "sustain[ing] a government undertaking as a whole," but instead only are compensating the state for the cost that particular employer caused the state to incur.[19]  Id. at 122.

_____

[17]The bankruptcy court used the word "permit."  Perhaps the word "authorize" might have been better as it is possible that outside of the aegis of the unemployment compensation laws a private insurance company could insure a non-profit employer for losses attributable to its reimbursement obligations.  We hasten to add, however, that we do not predicate our result on this probably theoretical possibility.

[18]The Court of Appeals for the First Circuit considered the Massachusetts statute creating the commonwealth's reimbursement option.  We note that Chief Judge Scirica cites Boston Regional I in his dissent but does not attempt to distinguish that case which is inconsistent with his result.

[19]In a later decision involving the same debtor, the same court determined that mandatory payments to Massachusetts' Uncompensated Care Pool are taxes for bankruptcy purposes.  In re Boston Regional Medical Ctr., Inc., 365 F.3d 51 (1st Cir. 2004) ("Boston Regional II").  The court distinguished the payments to the Uncompensated Care Pool from the unemployment compensation reimbursement payments because the former are "geared to sustain, as a whole, the stated governmental undertaking of providing access to health care for low-income uninsured and under-insured residents."  Id. at 61.

According to the bankruptcy court, this distinction did not cause the reimbursement obligation to fail the Lorber-Suburban test. The bankruptcy court stated, "[t]he fact that employers paying contributions absorb a greater share of the cost, does not mean that payments in lieu of contributions are not universal, and therefore not taxes. The payment burden of many tax statutes falls unevenly on taxpayers." 282 B.R. at 338. Also, the bankruptcy court disagreed with the Court of Appeals for the First Circuit's conclusion that the legislative history of FUTA supported a conclusion that the reimbursement obligation is not a tax.

In Boston Regional I, the court of appeals acknowledged that a reasonable argument could be made that payments in lieu of contributions could be called taxes. Boston Regional I, 291 F.3d at 121-22. What "tip[ped] the scales" for the court was the commonwealth's ability to require a non-contributory employer to post a bond to secure payments required by it. Id. at 122. Because the commonwealth did not require a bond of the non-profit employer, the court determined that the commonwealth, and not the class of general unsecured creditors, should endure the result of its decision to risk that benefits would not be repaid. Id. at 123. The ability to require a bond made the commonwealth something more than an involuntary creditor, thus undermining a traditional policy reason behind affording priority status to governmental obligations. Id. at 122-23. In this case, the bankruptcy court acknowledged that New Jersey law permits NJDOL to require a bond, and that if a bond were required, "a surety with the same claim as the government could be disadvantaged if the government claim received priority," but concluded that the tax-like characteristics of the reimbursement obligation outweighed this one non-tax-like characteristic. 282 B.R. at 340-41.

In its decision, the bankruptcy court relied on the district court's opinion in In re Sacred Heart Hospital of Norristown, 209 B.R. 650 (E.D. Pa. 1997). In that case, the district court, after applying the Lorber-Suburban factors, concluded that a non-profit employer's obligation to reimburse the Pennsylvania Unemployment Compensation Fund is an excise tax entitled to priority. Id. at 658. The district court stated: "Payments in lieu of contributions are excise taxes and entitled to priority in bankruptcy. First, without a doubt the payments are 'involuntary.' See 43 P.S. § 781(a)(1) ('[e]ach employer shall pay contributions . . .') . . . Simply stated, all employers–for-profit and nonprofit–must pay them." Id. at 656.

16

The district court reasoned in <u>Sacred Heart</u> that the reimbursement payments benefit the public because the provision of unemployment compensation benefits protects all taxpayers from demands that unemployed persons otherwise would make on the welfare system. <u>Id</u>. at 656.  The district court also held, "the law satisfies the two 'public purpose' factors articulated by the Sixth Circuit in <u>Suburban II</u>.  The obligation is universally imposed on all employers. . . . Further, . . . there are no private creditors with claims sufficiently similar to violate the bankruptcy policy of equal distribution."[20]  <u>Id</u>. at 656.

### 3.  Functional Examination of a New Jersey Non-Profit Employer's Reimbursement Obligation

After making an independent analysis predicated on a functional examination such as that applied in <u>CF & I Fabricators</u>, we have determined that United's obligation to reimburse NJDOL for unemployment compensation benefits is not a tax for bankruptcy purposes.  We acknowledge that this case is close, given that reimbursement payments and quarterly contributions are complementary.  But the fact remains that while reimbursement payments are related to unemployment compensation contributions, they are not the same obligation.  Though we characterized the contribution obligation as a tax in <u>In re Wm. Akers, Jr., Co.</u>, United's duty to reimburse NJDOL is a different kind of obligation as it is better characterized, in view of its direct correlation to

---

[20]The district court in <u>In re Sacred Heart</u> distinguished unemployment reimbursement obligations from workers' compensation premiums in its analysis.  <u>In re Sacred Heart</u>, 209 B.R. at 657-58.  The district court discussed a line of cases holding that worker's compensation premiums are not taxes where the state law at issue provided employers with the option to subscribe to a state fund, to obtain private insurance, or to self-insure.  <u>Id</u>.  The reasoning behind this line of cases is that where a state does not monopolize coverage, the state looks more like just another private participant and less like a taxing authority.  <u>Id</u>.  The district court observed that the Commonwealth of Pennsylvania "monopolizes" the unemployment compensation system because employers do not have a private insurance or self-insurance option.  <u>Id</u>.  While this observation may be correct, and may support the conclusion that unemployment compensation <u>contributions</u> are taxes, it does not speak to the heart of the matter before us, the nature of the function or effect of the <u>reimbursement</u> obligation.

17

payments NJDOL made by reason of United having terminated employees, as an alternative to paying taxes rather than as an alternative method to pay a tax.

While we agree with the conclusion of the Court of Appeals for the First Circuit that a non-profit employer's reimbursement obligation is not a tax, we support our conclusion with different emphasis. We do not believe that NJDOL's ability to require a bond to secure an employer's payment dictates a conclusion that this obligation is not a tax.[21] Instead, we believe that a broader examination of the nature of the reimbursement obligation reveals its non-tax character.

We question the district court's treatment in Sacred Heart of contributions and reimbursement payments as similar for bankruptcy purposes under the Pennsylvania statute. See In Re Sacred Heart, 209 B.R. at 656. More to the point, we conclude that under the New Jersey statute at issue here contributions and reimbursement payments are distinct obligations. According to the New Jersey statute establishing the contribution obligation, "[e]mployers other than governmental entities, whose benefit financing provisions are set forth in section 4 of P.L. 1971, c. 346 (C. 43:21-7.3), and those nonprofit organizations liable for payment in lieu of contributions on the basis set forth in section 3 of P.L. 1971, c. 346 (C. 43:21-7.2), shall pay to the controller for the Unemployment Compensation Fund, contributions . . . ." N.J. Stat. Ann. § 43:21-7 (emphasis added). Section 43:21-7.2 provides, "[n]otwithstanding any other provisions of the Unemployment Compensation Law, for payments of contributions by employers, benefits paid to individuals in the employ of nonprofit organizations . . . shall be financed in accordance with the following provisions . . . ." Additionally, N.J. Stat. Ann. § 43:21-19(f) (West 2004) provides separate definitions for "contributions" and for "payments in lieu of contributions."

_____

[21]The Court of Appeals for the First Circuit noted, "[w]e do not hold that the availability of a surety bond, as in this case, would alone be sufficient to render an obligation not a tax," but that combined with the other reasons before the court, the bond issue was the "decisive factor." Boston Regional I, 291 F.3d at 123 n.14. The New Jersey statute also provides that the state may require a bond. N.J. Stat. Ann. § 43:21-7.2(h) (West 2004). This circumstance is not determinative, however, because the state in general may require a bond for the payment of a state tax. See N.J. Stat. Ann. § 54:49-2 (West 2002).

18

The language of sections 43:21-7.2 and 43:21-19(f) evidences that, even though under New Jersey law service to a non-profit employer is not excepted from the definition of "employment," see N.J. Stat. Ann. § 43:21-19(i) (West 2004), the statute does except non-profit employers engaging in "employment" from the contribution obligation section 43:21-7 creates. Instead, section 43:21-7.2 contains a different kind of obligation for those non-profit employers. The bankruptcy court determined that under the above statutes, all New Jersey employers must "make payments." 282 B.R. at 338. That may be true, but the key here is that contributory payments are a different obligation than reimbursement payments.[22]

Having concluded that contributions and reimbursement payments are different obligations, we next consider the nature of the reimbursement obligation. One major characteristic of the reimbursement obligation is that payments in lieu of contributions reimburse NJDOL for unemployment benefits actually paid and do not raise funds to support a general governmental undertaking.[23] In contrast, quarterly contribution payments do support a general governmental undertaking. An employer paying the quarterly contribution tax is helping to create a fund from which NJDOL appropriately pays benefits. A contributory employer is obligated to

_____

[22]The legislative history of section 43:21-7.2 and of FUTA support our conclusion that the New Jersey statute creates two different obligations. According to the Senate Report accompanying FUTA, "[s]tate programs would be required to permit nonprofit organizations the option of reimbursing the state for unemployment compensation payments attributable to service for them rather than paying regular state unemployment compensation taxes." S. Rep. No. 91-752, 1970 U.S.C.C.A.N. 3606, 3609. Similarly, the sponsor statement to the bill that created the non-profit reimbursement obligation in New Jersey states, "the nonprofit organizations are afforded a choice to either elect to pay contributions or to make reimbursement to the fund for benefits paid." Sponsor Statement, N.J. Stat. Ann. § 43:21-7.2, Laws of 1971, Ch. 346, Bill No. A2501 (1971).

[23]The reimbursement payments arguably are used for a government-sponsored purpose. If, however, the standard is whether monies collected are used for any government-sponsored purpose, it is hard to imagine any claim held by a government that would not qualify as a tax.

contribute even if it does not actually use the government program, here unemployment compensation benefits paid to former employees. A payment in lieu employer, however, only reimburses NJDOL for payments NJDOL has made to its former employees.

We disagree with the bankruptcy court that this distinction is immaterial; in fact, this distinction is crucial in unveiling the operation and actual effect of the reimbursement obligation. The bankruptcy court's focus on its observation that "[t]he payment burden of many tax statutes falls unevenly on taxpayers" is misplaced. 282 B.R. at 338. The issue is not whether some taxpayers pay more or less, but rather whether an entity is paying taxes or incurring some other type of obligation. Again, the relevant distinction is not whether some pay more or less, but whether some are paying to sustain a general governmental undertaking while others only are reimbursing the system for exactly the benefits paid to their former employees.[24]

Thus, rather than a tax, the reimbursement obligation is more like a promise in exchange for the privilege of employing individuals in the state without being required to pay state unemployment compensation contributions. The state will allow a non-profit employer to conduct business without making contributions to the state unemployment compensation fund, and the state will pay the unemployment compensation benefits due to the non-profit employer's former employees, but this creates a debt, and the state insists on being repaid.

NJDOL's observation that if the reimbursement option is not selected, a non-profit employer must make contributions does not undermine this point. Rather than address the nature of the reimbursement payments, this argument only highlights the statutory scheme granting non-profit employers with a choice unavailable to other employers. We similarly reject NJDOL's argument that because federal unemployment taxes are considered excise taxes, and given the close relationship between federal unemployment taxes and state unemployment taxes, the reimbursement payments

---

[24]Even if, as explained by NJDOL, contributions and reimbursements once paid are intermingled in the same state fund, that fact does not negate the reality that employers electing to make reimbursement payments pay only for the benefits disbursed from the fund by reason of their termination of employees.

also must be excise taxes.  The role of FUTA as germane to our inquiry is limited to its mandate that states must provide non-profit employers with a reimbursement obligation option.  That mandate still leaves open the question surrounding the nature of this obligation.

While National Cable was decided in a different context, its reasoning is transferable, and it further illuminates the non-tax character of the reimbursement obligation.  See, e.g., In re Jenny Lynn Mining Co., 780 F.2d 585 (6th Cir. 1986) (applying reasoning of National Cable to determine whether strip mining permit obligation is an excise tax entitled to bankruptcy priority); In re Trism, Inc., 311 B.R. 509 (8th Cir. BAP 2004) (borrowing reasoning of National Cable to determine whether a highway user fee is an excise tax entitled to priority).  In National Cable, the Supreme Court pointed out that a "disregard [of] benefits bestowed by the Government on a taxpayer" is indicative of a tax.  National Cable, 415 U.S. at 340, 94 S.Ct. at 1149.  The government's ability to manipulate the assessment also is characteristic of a tax.  Id. at 341, 94 S.Ct. at 1149.  In contrast, a situation in which a payment is exchanged for a government benefit not shared by others indicates that the debt is not for a tax.  Id. at 340-41, 94 S.Ct. at 1149.

NJDOL, in demanding reimbursement, may not disregard the benefits it bestowed.  In fact, the reimbursement obligation directly is linked to the benefits it paid.  Non-profit employers enjoy a benefit not shared by other employers, as they may operate in the state without making quarterly contributions to the state unemployment compensation fund.  Additionally, the state cannot manipulate a reimbursement obligation to encourage or discourage certain activity.  Again, under the reimbursement program, the government pays out benefits, and the non-profit employer simply refills the government's coffers.

Contribution and reimbursement payments are distinct obligations with different sets of accompanying rules.  They do not create one obligation that is applied to all New Jersey employers.  Reimbursement payments are made in lieu of, or instead of, contributions.  Reimbursement payments thus are something different than contributions, and the issue is whether those payments are excise taxes.  Our functional examination reveals that reimbursement payments are not taxes, and therefore cannot be classified as excise taxes entitled to priority under section

21

507(a)(8)(E).

## IV.  CONCLUSION

For the reasons stated above, the order of the district court of November 13, 2003, will be reversed and the case will be remanded to that court, which in turn shall remand the matter to the bankruptcy court to reverse its order granting NJDOL's claim priority and for further proceedings consistent with this opinion.

SCIRICA, *Chief Judge*, dissenting.

In this difficult and close case, I respectfully dissent. At issue is whether the New Jersey Department of Labor's ("NJDOL") claim seeks recovery of an excise tax that would entitle it to bankruptcy priority under 11 U.S.C. § 507(a)(8)(E).

New Jersey's unemployment compensation fund is a general social welfare program paid for by contributions from both for-profit and non-profit employers. Like the for-profit employer, the non-profit employer's required contribution funds the New Jersey statute's objective – to ameliorate "economic insecurity due to unemployment." N.J.S.A. § 43:21-2. For this reason, the non-profit employer's contribution more closely resembles a tax than other kinds of government assessments, such as debt obligations, fees in exchange for benefits, or penalties. In my view, the distinction between the contributory payment and the reimbursement obligation is one of degree rather than kind. Because both forms of unemployment contribution constitute a tax for bankruptcy purposes, I would affirm the judgment of the District Court.

I.

In *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, the Supreme Court conducted a "functional examination" to determine whether the levy in question was entitled to bankruptcy priority because it more closely resembled a tax than another form of government assessment. 518 U.S. 213, 224-25 (1996). In my view, the question is whether the non-profit employer's reimbursement obligation here functions more like a tax than another kind of assessment, such as a debt, a fee in exchange for a benefit, or a penalty.

A. Debt obligation

The Supreme Court has distinguished tax obligations from ordinary debt because unlike debt, taxes are involuntary. *N.J. v. Anderson*, 203 U.S. 483, 492 (1906); *See also In re Boston Reg'l Med. Ctr., Inc.*, 291 F.3d 111, 120 (1st Cir. 2002) (citing *Anderson*, 203 U.S. at 492). The non-profit employer's reimbursement obligation here lacks the distinguishing characteristics of debt. It is not a voluntary obligation, nor is it

23

based on express or implied contract.[25]  Rather it is mandated by statute.[26]  The 1970 FUTA amendment required formerly excluded non-profit employers to pay the contributory tax or to make reimbursement payments in its place.   Although not identical in form, the 1970 FUTA amendment imposed on non-profit employers a burden similar to that imposed on for-profit employers – an obligation to fund New Jersey's unemployment

[25]The majority holds the reimbursement obligation more closely resembles a debt, likening the non-profit's obligation to a "promise in exchange for the privilege of employing individuals in the state without being required to pay state unemployment compensation contributions."   While this is plausible, I believe these are the very characteristics of debt that the reimbursement obligation lacks – it is not made voluntarily nor is it pursuant to a contractual agreement.

[26]Before 1970, non-profit organizations did not pay the unemployment compensation tax or contribute to state unemployment compensation funds.   26 U.S.C. § 3306(c)(8) excluded from "covered" employment "service performed in the employ of a religious, charitable, educational, or other [tax exempt] organization."   *See* Pub. L. 86-778, § 533, 74 Stat. 984; *Cal. v. Grace Brethren Church*, 457 U.S. 393, 398 n.6 (1982).  Congress amended FUTA in 1970, requiring state unemployment plans to cover employees of non-profit organizations and obligating non-profit employers to contribute to the state unemployment compensation fund.   *See* 26 U.S.C. § 3309(a)(1).   The 1970 amendment extended state participation to non-profit organizations because it recognized that "unemployment affects a substantial number of their employees[.]"   S. Rep. No. 91-752, at 48-49, *reprinted in* 1970 U.S.C.C.A.N. 3606, 3617-18 (1970).  But at the same time, the federal scheme sought to minimize the cost to the non-profit employer, limiting its obligation to the actual amount that former employees cost the unemployment compensation fund. *See id*.  ("These [non-profit] organizations, which are often dependent upon charitable contributions, should not be required to share in the costs of providing benefits to workers in profit-making enterprises.").

payments furthering the goals of the unemployment compensation regime.

## B. Fee in Exchange for a Benefit

The non-profit employer's reimbursement obligation functions more like a tax than a fee in exchange for a benefit. The Supreme Court has distinguished tax obligations from government fees in exchange for benefits or for services rendered. *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340-42 (1974); *see also County Sanitation District No. 2 of Los Angeles County v. Lorber Indus. of Cal. (In re Lorber)*, 675 F.2d 1062 (9th Cir.1982) (holding that sewer and water user fees imposed for voluntary use of system are not taxes); *In re Adams*, 40 B.R. 545, 548 (E.D. Pa. 1984) ("The 'inherent character' of the charges are premised upon an implied agreement to pay for the water and sewer services furnished.").

National Cable held that costs imposed by the Federal Communications Commission ("FCC") on certain broadcasters to cover the expenses of FCC oversight did not constitute a tax. The Court's distinction between tax and fee rested on whether the obligation imposed on the regulated entity supported the FCC's function "to safeguard the public interest in the broadcasting activities of members of the industry" or supported a "benefit" of "value to the recipient." *National Cable*, 415 U.S. at 341-42. The Court found the predominant feature of the imposed cost was to benefit the broadcasters, not the public – hence it was a fee, not a tax.[27] There were three

---

[27]FCC oversight benefitted the cable operators by, for example, enabling them to broadcast without interference. *National Cable*, 415 U.S. at 343. In addition, the Court remanded for a recalculation of the fee because it determined that the fees imposed by the FCC were too broadly calculated. *Id*. The FCC had imposed all of the costs of regulating cable television systems to the industry and none to the general public. *Id*. at 341-42. As a result, the fee schedule in question resembled a tax because the value of the fee was greater than the service provided to the recipient. *Id*.

major factors that informed the holding in *National Cable*: (1) whether payment of the assessment is voluntary, that is, whether it could be avoided by not taking advantage of the government service, *id*. at 340; (2) whether the government assessment is in exchange for a specific government service that benefits the entity paying in a manner "not shared by other members of society," *id.* at 341; and (3) whether the government assessment is collected to compensate the government for the expense of providing the service to the entity, but not to raise revenues to cover the cost of providing the service for others. *Id*. at 341-42.

In my view, only the last consideration favors reversal here. As the majority notes, the reimbursement obligation does not support the costs of other employers' former workers or of administering the unemployment compensation fund. Instead, a non-profit employer only reimburses the state for the costs imposed by its own former employees. Nevertheless the statutory purpose of the obligation is to benefit the former employees and the public good, not the employer.

Moreover, application of the first and second factors supports the view that this reimbursement obligation is a tax.[28] Considering the first factor, there is no voluntary act here. *National Cable* stated that a fee (as opposed to a tax) "is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station." *Id.* at 340. If the non-profit

---

[28]*In re Sacred Heart Hosp. of Norristown* held that reimbursement obligations to the Pennsylvania unemployment compensation fund constituted a tax entitled to priority for bankruptcy purposes. 209 B.R. 650 (E.D. Pa. 1997). After considering who benefits from the reimbursement obligation and whether it is voluntary, the court concluded that "the payments are used to benefit the public generally because compensating unemployed workers reduces the chances of their becoming poor and making demands on the federal and state welfare systems and thus all taxpayers" and that the reimbursement obligation is "without a doubt . . . 'involuntary.'" *Id*. at 656.

employer does not elect to reimburse, then it must contribute in the same manner as a for-profit employer. That is, the non-profit employer either pays the contributory tax or elects to make payments in lieu of the tax, but it cannot evade its responsibility to the unemployment compensation fund altogether. The non-profit employer is not a voluntary "applicant" for "benefits," but rather, a required participant in the unemployment compensation program.

Considering the second factor, the non-profit employer does not enjoy a "benefit" that is "not shared by other members of society." In this case, the most direct "recipient of the benefit" is the former employee that receives payments from the unemployment compensation fund. These payments also benefit the public interest, helping to reduce the strain on society that unemployment would otherwise cause. But the payments do not grant an affirmative benefit on the non-profit employer. In *National Cable*, by contrast, the broadcasters' fees benefitted themselves, at least in part, by paying for the administrative cost of FCC oversight.

It would be inaccurate to characterize the "benefit" of the reimbursement obligation as the ability to operate in New Jersey without having to pay the contributory tax. Such a characterization differs from the fee-for-benefit scheme in *National Cable*, where cable broadcasters paid a fee in exchange for the benefits of FCC oversight. In *National Cable* the Supreme Court cited as an example of a fee-for-benefit, "a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station." *Id.* at 340. But here, it is difficult to conceptualize the reimbursement obligation as a license, permit, or operating fee.[29] In short, the paradigm fee in exchange for a benefit, under *National Cable*, is an applicant that pays in exchange for

_____

[29]The differences between *In re Jenny Lynn Mining Co.*, 780 F.2d 585 (6th Cir. 1986), and this case are instructive. Unlike the reimbursement obligation here, the government assessment in *In re Jenny Lynn Mining Co.* directly benefitted the applicant by licensing it to engage in operating a strip mine.

27

administrative oversight or for a license to engage in a certain business activity. An unemployment reimbursement obligation – which supports a general social welfare program – does not comfortably fit into that model.

The majority views this differently, holding that the non-profit employer enjoys the "benefit" that it "may operate in the state without making quarterly contributions to the state unemployment compensation fund." Nonetheless, before 1970, non-profit employers had no obligation to the unemployment compensation fund at all. I find more persuasive the view that, instead of bestowing a benefit, the 1970 FUTA amendment imposed on non-profit employers a new burden to support the unemployment compensation fund, with the option to pay the quarterly tax or reimburse the state for costs.

C. Penalty

The reimbursement obligation functions more like a tax than a penalty. The Supreme Court distinguished taxes from penalties on the basis that a tax supports government policies while a penalty punishes unlawful activity. *Reorganized CF & I Fabricators*, 518 U.S. at 224. The non-profit employer's reimbursement obligation is clearly not a penalty on unlawful activity. It is a burden imposed on non-profit entities lawfully engaged in employment.[30]

-----

[30]It bears noting that failure to give the reimbursement obligation priority in bankruptcy will likely increase non-profit employers' operating costs – a result contrary to the federal and state legislative objectives. *See* S. Rep. No. 91-752, at 48-49, *reprinted in* 1970 U.S.C.C.A.N. 3606, 3617-18 (1970) (stating intent to minimize cost to non-profit organizations because they "are often dependent upon charitable contributions"). NJDOL may require from non-profit organizations "a bond or other security . . . for the payment of any taxes, interest, and penalties imposed pursuant to any state tax law[.]" N.J.S.A. 54:49-2. This allows New Jersey to shield itself, in advance, from an unpaid reimbursement obligation. Generally, not requiring a bond lowers the costs to non-profit employers of doing business in New Jersey. Allowing payments in lieu of the contributory tax and not requiring

## II.

The final issue is whether the non-profit employer's reimbursement obligation constitutes an excise tax on a pre-petition transaction under 11 U.S.C. § 507(a)(8)(E).[31] The statute requires that reimbursement obligations constitute an "excise tax" on "a transaction," "occurring before the date of the filing of the petition." The Bankruptcy Code provides no definition of "excise" or "excise tax." *Reorganized CF & I Fabricators*, 518 U.S. at 220. In determining whether a tax is an "excise tax," courts have used a range of definitions, some broader than others. In the context of bankruptcy priority, the non-profit employer's reimbursement obligation constitutes an excise tax on a transaction – a tax on the act of employing workers. *See In re Suburban Motor Freight, Inc.*, 998 F.2d 338, 340 n.3 (6th Cir. 1993) (noting that an excise tax may be based upon a transaction or act of employing); *see also In re Deroche*, 287 F.3d 751, 757 (9th Cir. 2002) ("act of employing a worker without carrying required insurance" constitutes a "transaction" under 11 U.S.C. § 507(a)(8)(E)); 9E Am. Jur. 2d *Bankruptcy* § 3099 ("For priority purposes, an 'excise tax' covers practically any tax which is not an ad valorem tax and which is imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege."). All of the employment that contributed to United Healthcare's reimbursement obligation occurred pre-petition. Therefore, the reimbursement obligation is an excise tax on a pre-petition

---

a bond both reduce the cost of non-profit employers' obligations. *See* Amy L. Henrich, *Preferential Treatment of Charities Under the Unemployment Insurance Laws*, 94 Yale L.J. 1472, 1478 n.35 (1985) ("The present value of a future debt obligation decreases as the payment is deferred into the future.") .

If the reimbursement obligation is not entitled to priority in bankruptcy proceedings, NJDOL may well require a bond from non-profit employers. Requiring a bond works against FUTA's stated objective to minimize the cost of non-profit organizations' participation in the unemployment compensation scheme.

[31]The majority did not have to reach this issue.

transaction.

For these reasons, I would have affirmed the judgment of the District Court.